MARGARET STAEDLER, PLAINTIFF-RESPONDENT, v. PHILIP STAEDLER, DEFENDANT-APPELLANT.

Argued February 5, 1951—Decided March 5, 1951.

382

*Mr. Vincent P. Torppey* argued the cause for the appellant; *Mr. Joseph F. Walsh* on the brief.

*Mr. Nathan A. Whitfield* argued the cause for the respondent.

The opinion of the court was delivered by

OLIPHANT, J.   This is an appeal from a judgment *nisi* entered in the Chancery Division setting aside and declaring null and void a decree of absolute divorce granted the appellant by the Eleventh Judicial Circuit Court of the State of Florida, dated January 28, 1948, and granting a divorce to the respondent on the ground of adultery but denying alimony to the respondent.   The appellant appealed to the Appellate Division from the judgment *nisi* on the question of jurisdiction, on the merits and the allowance and amount of counsel fee.   The respondent cross-appeals from the denial of alimony. These appeals were brought here on our own motion.

The parties were married on June 20, 1937, in East Orange, New Jersey, and lived in Verona as husband and wife, later moving to Montclair, New Jersey, until the appellant left for Florida to obtain a divorce under circumstances related hereafter.

The appellant has been engaged for the last 25 years in the painting and decorating business in the northern part of this State under the trade name of the Verona Decorating Company with offices in Verona and Newark.   He is also the controlling stockholder in the P. C. Staedler, Inc., Maintenance, Inc., and 500 Bloomfield Avenue, Inc.   Through these New Jersey corporations the appellant operates a substantial business in his line and employs a considerable staff of men, both in the field and in the office.   The respondent was actively engaged with him in the business as secretary and bookkeeper in the Verona offices.

There was considerable bickering during their married life and at various times the appellant asked the respondent for a divorce but the respondent always refused, whereupon he finally threatened to go to another state and procure one.   In 1946, over one year prior to the Florida decree here in question, the appellant communicated with Morris G. Warner concerning a divorce in Florida.   Warner is a member of the bar of this State and of Florida and later represented the appellant in the Florida proceedings.   The respondent in the meanwhile had consulted with present counsel and when the

appellant learned of this he threatened to leave the State, turn over his assets to a dummy corporation, get a divorce and leave her without anything. He said there was no need for two lawyers in the case, that his lawyer could take care of everything by an agreement.

Finally the appellant took the respondent to his lawyer Morris Rubin in Bloomfield and discussed with him their difficulties and affairs and Rubin drew an agreement which is the nub of this appeal. The agreement followed an oral discussion of the problems and a study of a preliminary draft thereof by both the parties. Rubin testified that he did not advise the wife as to her rights because she never asked him.

The written agreement was signed on October 17, 1947, and under its terms the appellant agreed to pay his wife $60 a week until the payments totaled $20,000. It further provided that, when and if their home on Park Street, Montclair, New Jersey, was sold, title to which was apparently in both names, $10,000 from the proceeds of the sale would be deposited in a trust fund to be paid to the wife in weekly payments of $60, except that she could draw therefrom $1,500 at any time. However, no weekly payments were to be made from this trust fund until the wife had been paid $10,000 in weekly payments of $60 as first mentioned above. In all the wife was to receive $20,000 to be secured by a non-interest bearing note signed by the appellant for $20,000. The wife also was to receive a 1946 De Soto car valued at $2,500.

On her part she agreed to withdraw from the business and to waive, release, and bar herself of all right of dower or other claim in all real property the appellant then owned or thereafter acquired, if the appellant did not breach the agreement.

She also further agreed to the following terms and conditions which are pertinent here:

"5. It is further agreed that party of the second part shall have the right to occupy that part of the house on Park Street, in the Town of Montclair, which she presently occupies, until such time as the said house is sold, or at such time as the party of the first part procures a final decree of divorce from the party of the second part, or sooner than either of the periods above set forth, if she so desires, but not later than the periods above set forth.

7. The party of the second part agrees promptly to execute any papers, and enter, or cause to be entered any appearance required in the divorce proceedings to be instituted by the party of the first part, without delay. Should the party of the second part oppose said divorce proceedings the said trust shall become inoperative, and the monies deposited thereunder shall be returned to the party of the first part.

11. * * * If the party of the first part shall hereafter obtain a decree of divorce against the party of the second part, nevertheless, this agreement shall continue in full force and effect.

12. It is further agreed that the party of the second part shall, at any time or times, make, execute and deliver any and all such further instruments as the party of the first part shall reasonably require for the purpose of giving full force to this agreement and to the terms and conditions thereof."

The appellant testified that he left for Florida a few days after the agreement was signed, but the correspondence he engaged in with his wife and his associates indicates that he arrived in Florida in the middle of November, 1947. By his own direct admission and his testimony as to the dates of the discussions which led to the consummation of the above agreement, the appellant certainly was not in Florida on or about September 18, 1947, as he testified in the Florida proceedings or as testified to here by his Florida attorney.

All during the time he was in Florida he constantly directed the business through instructions sent to the respondent up to December 31, 1947, when she by agreement withdrew from the business, and thereafter through the manager, Richard Coutant, who testified he consulted with the appellant in Florida by letter and telephone as to all business decisions and policies. The appellant maintained bank accounts in the Verona Trust Company, Federal Trust Company in Newark, and the Bank of Montclair. All of these accounts were never closed and are open and in use at the present time. The testimony clearly shows that during the period in question, October 17, 1947, to May, 1948, the appellant directed and has been before and since actively associated with the business and has controlled all of its policies and activities.

About the time he left for Florida, the respondent wife finally consulted an attorney of her own choice, Charles E.

Garrett. He testified she had read the agreement and knew what it meant and wanted to go through with it. Shortly thereafter the appellant, in early December, called the respondent from Florida and told her there was being sent to her a power of attorney authorizing one Maxwell Hyman to represent her in the Florida proceedings and asked her to execute it. Subsequently Rubin called her and told her he had received the power of attorney; he in turn sent it to Garrett, and in answer to a call from Garrett she went to his office, executed it and mailed it to her husband. At about the same time, at the suggestion of his Florida attorney, the appellant admits he paid $60 to Maxwell Hyman, a Florida lawyer, to represent the respondent in the Florida action. He protested paying this since he considered that the $750 he had paid Rubin would include all the costs, because he understood it was a "package deal" with everything taken care of by the one fee paid to Rubin.

With this attended to the appellant returned to the home in Montclair for the Christmas holidays. He and his wife attended a number of social functions together and apparently shared the same bedroom, although he denies the inference that they resumed marital cohabitation.

He returned to Florida after the holidays and on January 11, 1948, he wrote his wife asking her to send an authorization to Maxwell Hyman to represent her and enclosed a copy of such authorization in his handwriting dated November 28, 1947, which she was to sign, which among other things stated: "I am enclosing herewith your fee for taking care of this and representing me." This despite the fact that the appellant and Hyman knew he had already paid Hyman the fee. The respondent signed and mailed the letter to Hyman as required.

The Florida complaint for divorce was filed the next day, January 12, 1948. An answer was filed by Hyman on behalf of the respondent, wherein he admitted the jurisdictional allegations and residence of the plaintiff in Florida. The gravamen of the complaint was extreme cruelty. The proofs were taken before a master. There was minimal perfunctory cross-examination by Hyman, who did little more than offer and

prove his power of attorney to appear for the respondent. On the report of the master, the Florida Circuit Court entered a decree of divorce *a vinculo* in favor of the appellant here. The fraudulent purpose of the appellant here was a *fait accompli* due to the culpable failure of the appellant and the attorneys of both parties, here and in Florida, to discharge their sworn duties.

The proof offered on the merits in the Florida cause was that respondent here was unjustifiably charging him with having illicit relations with other women, including a Mrs. Klinge, which was making a nervous wreck of the appellant. These charges of the wife evidently had more than a modicum of truth to them and though they may have been painful and distressing to the appellant, would not amount to extreme cruelty, here or in most jurisdictions. The appellant testified that Mrs. Klinge came to Florida, a few days after his decree became final, and that they shared a room together in Delray, Florida, until she obtained her decree in April, 1948, through the same attorney, Morris G. Warner, who represented this appellant, and that they entered into a common-law relationship which continued after they both returned to Bloomfield, New Jersey, in May, 1948, where they lived as husband and wife; that a child was born of this relationship but that they returned to Florida on March 10, 1950, and were married there, and they both shortly thereafter returned again to Bloomfield. Presently another child is expected to be born of this alleged marriage.

The appellant made the payments under the agreement with respondent for seven months and in May, 1948, discontinued them because he claimed that he could not afford to continue them. After some discussion he finally suggested that the Park Street house be sold, but not for the purpose of establishing the trust fund set up by the agreement. This would have left the respondent without support. Instead of $20,000 she had received about $3,200, which included a lump sum of $1,500. The appellant then ordered the respondent to leave the Park Street home but she was able to arrange a mortgage on the property and out of the funds so raised she

paid the appellant $8,450 for his half interest in it, which he then sold and conveyed to her, and in return she gave a general release as to all claims against him. She was represented in this transaction by Garrett. She thus received only $3,200 instead of the $20,000 agreed to be paid under the original agreement.

The trial court held that the appellant never intended to and did not establish a *bona fide* domicile in Florida, and that while the United States Supreme Court has held that where the defendant in a divorce proceeding appears and participates therein and has an opportunity to raise the jurisdictional issue, the decree of divorce is ordinarily entitled to full faith and credit, *Sherrer v. Sherrer,* 334 *U. S.* 343, 68 *Sup. Ct.* 1087, 92 *L. Ed.* 1429 (1948) ; *Coe v. Coe,* 334 *U. S.* 378, 68 *Sup. Ct.* 1094, 92 *L. Ed.* 1451 (1948) ; *Peff v. Peff,* 2 *N. J.* 513 (1949), the learned trial judge believed these cases do not go to the length of requiring that full faith and credit must be given to a decree where the plaintiff acknowledges that the decree was obtained by a fraud practiced on the court of the foreign jurisdiction, as well as upon the State of New Jersey. He held that the State of Florida certainly has no interest which is infringed by a refusal to recognize a decree, thus confessedly obtained by a fraud upon it, with respect to persons with whom that state had no domiciliary concern.

He therefore tried the divorce cause on the basis that the Florida decree was void and the marriage to the co-respondent invalid. He found that the proofs established adultery. The co-respondent, Mrs. Klinge, was represented by counsel and was present in court, but failed to take the stand. The trial court denied alimony or support to the respondent since she had taken all the steps she had after consideration, including the final settlement and general release given by her to the appellant at that time, and considered her right to support a matter of judicial discretion. He awarded a counsel fee of $3,500 to the counsel for the respondent.

The basic question is the validity of the Florida divorce. Unquestionably it was the product of fraud upon the jurisdiction of Florida in which both the appellant and respondent

participated, and this fraud had its inception and is grounded in the agreement of October 17, 1947. A mere reading of that agreement indicates that the basic consideration for it was the undertaking by the wife to facilitate the procurement of a divorce by the husband in this State or any other state and required that the wife would enter "any appearance required in the divorce proceeding," and that should she "oppose said divorce proceedings the said trust shall become inoperative and the moneys deposited thereunder shall be returned to the party of the first part."

All bargains which have for their object or tendency the divorce of married people are opposed to public policy. Bargains to bring suit for divorce or to make no defense to such suit, or having for their object such purposes, are unlawful. 6 *Williston on Contracts* (*Rev. ed.*), § 1743. Such contracts are illegal and void in this State. *Lynde v. Lynde,* 64 *N. J. Eq.* 736 (*E. & A.* 1902); *Dennison v. Dennison,* 98 *N. J. Eq.* 230; affirmed, 99 *N. J. Eq.* 883 (*E. & A.* 1926). The illegality of a contract is to be determined by the law of the place of the contract. If that law makes the contract itself illegal, of course, it is void everywhere. 2 *Beale's Conflict of Laws, p.* 1227. This agreement is obviously contrary to the public policy of this State and is likewise contrary to the public policy of the State of Florida. *Gallemore v. Gallemore,* 94 *Fla.* 516, 114 *So.* 371 (1927); *Potter v. Potter,* 101 *Fla.* 1199, 133 *So.* 94 (1931); *Allen v. Allen,* 111 *Fla.* 733, 150 *So.* 237 (1933); *Frohock v. Frohock,* 117 *Fla.* 603, 158 *So.* 106 (1935).

The appellant admits that the purpose of the agreement was to suppress any inquiry that would disclose the fraud and make a mockery of any appearance by the respondent in the Florida proceeding, and that it was not intended that any divorce proceeding between the parties should be an adversary proceeding. Yet he contends that his Florida decree is protected by the full faith and credit clause of the Federal Constitution under the decisions by the United States Supreme Court in *Davis v. Davis,* 305 *U. S.* 32, 59 *Sup. Ct.* 3, 83 *L. Ed.* 26 (1938); *Sherrer v. Sherrer, supra,* and *Coe v. Coe,*

*supra,* and that those cases stand for the proposition that the requirements of full faith and credit bar a defendant from collaterally attacking a divorce decree on jurisdictional grounds in the courts of a sister state where there has been participation by the defendant in the divorce proceedings, where the defendant has been accorded full opportunity to contest the jurisdictional issues, and where the decree is not susceptible to such collateral attack in the courts of the state which rendered the decree.

We have carefully considered these cases and we do not believe that the full faith and credit clause of the Federal Constitution was ever intended to be used as a shield for or to give validity to the type of contract here under consideration, or to approve the acts performed pursuant thereto in cases where the ultimate purpose was to commit a fraud upon the jurisdiction of a court of one of the several sovereign states. Jurisdiction depends upon the existence of basic facts and a *bona fide* finding that the necessary facts actually exist, and where they do not exist it cannot be conferred upon any court anywhere by consent of the parties or by fraud. It presupposes a *bona fide* examination by a court of competent jurisdiction of such facts before any judgment can be entered by such court.

It cannot be disputed in this case that the *bona fide* domicile of these parties was and is in the State of New Jersey and that this State has a paramount interest in the status of its married domiciliaries. To hold that jurisdiction could be established in the Florida court or could be established there pursuant to the terms and conditions of this agreement is to reduce the marital relationship to the status of ordinary commercial transactions and to make it a matter of barter by bargain and sale in the commercial markets. It is to say that it is something that could be cancelled out by a general release in return for a monetary consideration agreed upon at arm's length bargaining. No matter what others may perceive to be the recent trend in the decisions of the United States Supreme Court in causes of this type, we are constrained not to impute to that court an intent that would reduce the solemn

relationship of husband and wife to the status just adverted to or that that court will acquiesce in a fraudulent scheme to use the principles of the *Davis, Sherrer* and *Coe* cases as a device to infuse constitutional virility into the judgment of a court of a sovereign state which has been deliberately deceived in proceeding to judgment in a cause over which in fact it had no jurisdiction.

The plain purpose of this agreement and all the acts perpetrated in carrying it out was to foreclose inquiry and use the appearance in the Florida court to perpetrate a fraud with the aid of the full faith and credit clause of the Federal Constitution.

We agree with the U. S. Supreme Court that in *Williams v. North Carolina,* 317 *U. S.* 287, 63 *Sup. Ct.* 207, 87 *L. Ed.* 279 (1942), the jurisdictional requirement of domicile is freed from confusing refinements about marital domicile, *Williams v. North Carolina,* 325 *U. S.* 226, 65 *Sup. Ct.* 1092, 89 *L. Ed.* 1577 (1945), but we do not understand these cases to hold that where a party obtains a decree by allegedly proving the requisite facts of jurisdiction which he subsequently admits to be untrue, false and perjurious, he is entitled by virtue of this decree to the protection of the full faith and credit clause. We find as a fact, as the trial court did below, that the appellant here was not resident in Florida on September 18, 1947, and that he did not reside in Florida for 90 days next preceding the institution of his action in that state, a requisite jurisdictional requirement. His own testimony and other testimony in this case indicates that he arrived in Florida somewhere after October 17, 1947, and probably on or about November 19, 1947, and that he was in fact in this State negotiating the terms of the agreement which is the nub of this case in the period between September 18, 1947, and October 17, 1947.

We further hold that the appearance in the Florida proceeding by Maxwell Hyman ostensibly on behalf of the wife was an appearance by him as agent for the husband who paid for his services and controlled his actions, and that there was

never any intention on his, Hyman's, part to enter a *bona fide* contest as to the jurisdictional elements of that court.

We are firmly of the opinion that the principles of the *Sherrer* and *Coe* cases, *supra*, only apply to a true adversary proceeding where the parties are represented by counsel of their independent choice and where there is an opportunity to make a voluntary decision on the question as to whether or not the case should be fully litigated either on the question of jurisdiction or the merits, and that once an election has been made by the defendant under such circumstances and conditions that then and then alone can the judgment of the court be *res adjudicata* and the full faith and credit clause operate for the advancement of justice rather than for the perpetration of a fraud.

But it seems to us the application of these principles presents an impossible dilemma to a defendant domiciled in this State. If personal jurisdiction is not obtained over such defendant either by personal service or an appearance in the cause, a decree of divorce may be had on constructive service only, and under certain circumstances and conditions be entitled to full faith and credit under the Federal Constitution, yet relief as to alimony, maintenance or support may be available to a defendant domiciled in this State when necessary. *Estin v. Estin*, 334 *U. S.* 541, 68 *Sup. Ct.* 1213, 92 *L. Ed.* 1561 (1948); *Kreiger v. Kreiger*, 334 *U. S.* 555, 68 *Sup. Ct.* 1221, 92 *L. Ed.* 1572 (1948).

In *Shepherd v. Ward*, 5 *N. J.* 92 (1950), and *O'Loughlin v. O'Loughlin*, 6 *N. J.* 170 (1951), we had occasion to deal with such situations pursuant to the authority of *R. S.* 2:50–37. In *Shepherd v. Ward, supra,* Mr. Justice Case had occasion to forcibly express our views as to the dilemma in which such a defendant finds himself, and we deem it necessary to partly repeat his observations here:

"Matrimonial suits are in some respects *sui generis*. Their reflex consequences are rooted deeply in the home, in society and in human relations generally. They ought not be permitted to take on the aspects of a game wherein wits, speed, daring and finesse prevail over elemental right and justice. Divorces and their incidents have become

little less than a national scandal. The efforts of most of the states to maintain equilibrium in the marital status and responsibilities of their domiciliaries are shockingly thwarted by the liberal provisions of a few jurisdictions, known as 'easy divorce' states, and by the facility with which, under prevailing conditions, the laws of more conservative jurisdictions, such as our own State, are mocked. Let us consider the philosophy of the instant case:—The wife, without justification, departs to another jurisdiction long enough to get a decree which by no skill or deception could be got here and forthwith returns with impudent effrontery to bring suit, relying upon the argument that the due faith and credit which are owing to the decree of another state should be linked with our own laws enacted to protect a deserving wife against an erring husband. Upon that reasoning she demands that the husband, having been wrongfully subjected to a broken home, shall further respond in considerable and continued maintenance payments. Thus, *in absentia,* one of our citizens, blameless by our standards, is gripped by the legal machinery of a state where he never has been and never expects to be, against which and against the citizens of which he had never sinned, where he is not known, and therefore where the asset of a life well lived and of a merited place in the community loses its value. The suit is instituted in a far state, going to which on an errand of this sort would of itself be an unreasonable burden; but in addition the husband does not dare to appear there either in person or by attorney because in so doing he yields to the jurisdiction. The inequity and the iniquity of such a situation should, if possible, be relieved."

The aggregate of all the thoughts expressed here underlie the decisions of this court in *Morrissey v. Morrissey,* 1 *N. J.* 448 (1949); *Peff v. Peff,* 2 *N. J.* 513 (1949); *Hubschman v. Hubschman,* 140 *N. J. Eq.* 284 (*E. & A.* 1947); *Meade v. Mueller,* 139 *N. J. Eq.* 491 (*Ch.* 1947), where at least there was some semblance of a *bona fide* contest.

█ The appellant makes the further point that the Florida decree does not have to be held valid by this court and that the respondent can be estopped from challenging it without determining its validity. The point here made is that she willingly and knowingly participated in the fraud after she had the opportunity of fully considering the situation and obtaining independent legal advice. But at no time was she told that the original contract agreement was null and void as against the public policy of this State. Yet it is true she was a willing co-conspirator.

■ The argument made by the appellant in support of the estoppel is really an argument for the application of the doctrine of clean hands to the particular facts of this case. But the application of the doctrine of clean hands is purely discretionary and should not be applied where it will produce a result *contra* to the firm public policy of this State in a matter of such fundamental importance as the preservation of the dignity of the marital relationship. 3 *Pomeroy's Equity Jurisprudence,* § 941, *p.* 736.

We do not deem our decision in *Tonti v. Chadwick,* 1 *N. J.* 531 (1949) controlling here. That was an annulment suit predicated on the theory that the wife's Mexican divorce from her previous husband was void, a fact which the plaintiff was both informed and aware of when he married the defendant here. That divorce was void on its face since it was not based on domicile or residence. The question there was one of comity and not full faith and credit. The Florida decree here is regular on its face; it could adversely affect the interest of this State, the marital status of the appellant and respondent, unless it has been adjudicated to be void.

■ For the foregoing reasons we deem that the decree of divorce granted the appellant in Florida was null and void on the ground of fraud actually and deliberately perpetrated upon that court by the appellant, and that since the appellant admits cohabitating with his present wife during the period prior to the ceremonial marriage and even before she was divorced from her husband, a cause of action for divorce on the ground of adultery has been established.

■ As to appellant's third point that the counsel fee was excessive, we have carefully considered the difficulties counsel encountered in this case and the persistence with which he pursued his attack, but we feel the award of $3,500 is excessive and that the fee should be reduced to $2,500 in view of all the circumstances.

■ As to the cross-appeal of the wife from the denial of alimony to her we are of the opinion such action was error since the court found it had jurisdiction sufficient to enter a decree of divorce, and alimony follows as an incident thereto

in a case where, after a consideration of all facts and circumstances, including the financial positions of the parties, such an award is deemed warranted. The judgment *nisi* is reversed to the extent that it denies alimony to the respondent so that the matter may be reconsidered and the amount of alimony determined in accordance with the procedure and practice of the court, making due allowance for such sums and property as the respondent received by way of settlement under her agreement and giving due consideration to the fact that there are children born of the so-called ceremonial marriage of the appellant and Mrs. Klinge.

The judgment of the Chancery Division is accordingly modified and as modified is affirmed.

A rule to show cause will forthwith issue as to why Morris Rubin, Esq., and Morris G. Warner, Esq., should not be disciplined for their conduct of and with respect to this cause.

Heher, J., concurring in result.

*For modification*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING and ACKERSON—6.