25 N.J. Super. 415 (1953)
96 A.2d 437
LEAH HANDEL ROSKEIN, PLAINTIFF,
v.
DAVID ROSKEIN, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided March 27, 1953.
*418 Mr. Benjamin M. Ratner, attorney for plaintiff.
Messrs. Kristeller & Zucker (Mr. Saul J. Zucker, appearing), attorneys for defendant.
GOLDMANN, J.S.C.
Plaintiff seeks modification of the separation and property settlement agreement entered into between the parties on June 8, 1948, both as regards alimony and support for herself and for the infant children of the marriage. She also demands judgment for certain claimed arrearages.
The parties were married in Newark on December 28, 1928. Three children were born to them: Joan, now of age and married; Patricia Anne, now 18, and Peter Michael, now 13. Patricia and Peter reside with plaintiff, but Patricia is presently attending college.
Differences apparently irreconcilable arose between the parties. In 1946 plaintiff engaged eminent counsel in Newark to negotiate a separation and property settlement agreement with her husband. The negotiations continued for more than two years, during which time many conferences were held and a number of drafts drawn. Plaintiff changed attorneys in the middle of these negotiations, eventually returning to her original attorney; defendant, himself an attorney specializing in workmen's compensation law, was represented by counsel of his own choosing. Finally, on June 8, 1948 the agreement here under attack was executed. Its preamble carried the usual statements that the parties *419 fully understood the terms and conditions of the agreement and "believe it to be fair, just, adequate and reasonable as to each of them," and accordingly they "freely and voluntarily accept such conditions and provisions." In summary, the agreement provided:
1. The parties were to convey the marital residence in South Orange to a company about to be organized.
2. The husband was to provide a five- or six-room apartment in the Oranges or Maplewood at his own cost and expense, as a suitable residence for his wife and children; until this was done they were to occupy the marital residence and the husband was to pay all carrying charges thereon.
3. The husband was to convey to the wife all his right, title and interest to the furniture, silverware and other household effects in the South Orange home, as well as to any jewelry, clothing or personal effects belonging to or used by her. He also gave her a Cadillac automobile.
4. The husband was to pay the wife $55 a week for her support and maintenance and $25 a week for the support and maintenance of each of the three children. If any child ceased to reside with the mother for more than a week at a time, payments for its support and maintenance were to be suspended until the child returned to live with the mother.
5. The husband agreed to pay the wife $350 annually as a clothing allowance and to furnish adequate wearing apparel for the children at his own expense.
6. The husband was to pay all tuition fees and expenses in any college or for the higher education of any of the children; also all fees and other expenses required to send any child to camp or for summer vacations. However, he alone was to determine whether any child was to attend college or camp, or be entitled to vacations at his expense.
7. The husband agreed to pay all medical and dental bills for the wife and children, but she was not to incur any such bills without first obtaining his approval, except in cases of emergency.
8. Support and maintenance for the wife, and her annual clothing allowance, were to cease and be discontinued on June 8, 1953, at the option of the husband. Such payments were to stop absolutely upon her remarriage. However, his obligations toward the children were to continue beyond the five-year period, or the remarriage.
9. The husband was to deliver to the wife all savings bank books, bank certificates and government certificates in which she was named as having an interest. He also agreed to deliver a $5000 20-year endowment policy on which he was to continue to pay the premiums; he agreed to pay off a $3000 loan made against that policy.
10. The wife agreed that she would not, under any circumstances, purchase or contract for the purchase of any property whatsoever *420 on the credit of her husband, and would indemnify and hold him harmless from any liability arising from such purchase.
11. The wife was to pay off obligations listed in an attached schedule which she had incurred without her husband's consent. He, in turn, agreed to advance $1250 to her attorney for costs and counsel fees connected with the agreement, including living expenses to August 30, 1948. He also undertook to pay $2000 in escrow, to be paid over to the wife when all of the obligations were paid, or to unpaid creditors.
The agreement expressly provided that it might be offered in evidence by either party in any matrimonial action at any time pending between them, and, subject to the approval of the court, was to be incorporated in any decree or judgment of divorce or separation entered in any such action, the obligations and covenants of the agreement to survive any such decree or judgment.
Immediately after executing the agreement plaintiff left by train for Reno, Nevada. She arrived there June 12, 1948 and promptly engaged counsel. He filed her complaint for divorce on the ground of extreme cruelty, "mental in its nature," on July 26, just two days after the expiration of the required six-week residence period. An answer was filed the same day by defendant's Reno counsel, acting under a power of attorney executed by the defendant in Newark on June 8, 1948. The answer challenged plaintiff's claim of bona fide residence in Nevada, charging that her residence was simulated and acquired solely for the purpose of establishing jurisdiction, and that she was perpetrating a fraud upon the court. Plaintiff replied immediately.
The clerk's stamp shows that all pleadings were filed on July 26, 1948 at 11:41 A.M. At 2:34 P.M. that afternoon the court filed its findings of fact and conclusions of law, as well as the divorce decree itself. One minute later the clerk filed the "Notice of Decision" bearing defendant's attorney's endorsement acknowledging service of the notice and waiving service of the findings of fact as well as of the expiration of the statutory time before the signing of such findings. The certified copy of the judgment roll is a silent but eloquent witness to the mechanical nature of the entire proceedings.
*421 Plaintiff's return trip ticket to Newark, New Jersey, was in her pocketbook at the very moment she was testifying in the Reno court. She took the first train back that evening, and this in the face of her sworn testimony only a few hours before that she had come to Nevada to make a "permanent home for an indefinite period of time"  a representation again solemnly made in the course of the rather perfunctory cross-examination. She now states that she changed her mind immediately after the decree was allowed  "that is my privilege"  and maintains that what she said in the Nevada court was the truth. Plaintiff's testimony in this regard is totally unbelievable. She knew exactly what she wanted to do from the very beginning of the negotiations leading to the separation agreement. Hers was a planned campaign.
The Nevada decree approved, adopted and confirmed the separation and property settlement agreement between the parties. In the course of the present action plaintiff repeatedly stated through her attorney that she does not attack the Nevada decree insofar as its divorce feature is concerned. She insists  despite the fact that the very same decree incorporates the agreement  that the agreement must be modified because: (a) she entered into it involuntarily; (b) it is unfair, inequitable and not for the benefit of herself or the infant children because the defendant failed truly to disclose his income and assets at the time the agreement was executed; (c) she did not have the benefit of independent advice; (d) the agreement was not fully investigated by the Nevada court; (e) the agreement is not final as to the future rights of plaintiff and the infant children because it is subject to modification, and (f) there has been a substantial change in circumstances which requires full investigation by this court as to defendant's present income and assets, as well as the needs of plaintiff and the infant children of the former marriage.
Some of the allegations in the Nevada proceedings become immediately pertinent. The verified complaint in that action states that "both parties entered into said agreement freely and voluntarily after receiving the advice of independent *422 counsel of their own selection and after a full and complete disclosure of the financial circumstances of each other," and it was "fair, equitable and just" under all the circumstances. Plaintiff's sworn testimony was to the same effect: that she entered into the agreement voluntarily and freely, after receiving the advice of independent counsel of her own selection and after full and complete disclosure of the financial circumstances of her husband. She testified that the agreement was fair, equitable and just, both as to herself and the interests of the minor children, and she asked the court to approve, adopt and confirm the agreement. The Nevada decree specifically adjudged that the agreement was "under all of the circumstances, fair, equitable and just; that the parties thereto entered into the same freely and voluntarily after receiving the advice of independent counsel of their own selection and after a full and complete disclosure of the financial circumstances of each other." The decree declares that the agreement settled and adjusted all rights and obligations arising out of the marital relation, including support and maintenance of the plaintiff, "past, present and future," and the care, custody, support, maintenance and education of the three minor children.
The record here supports plaintiff's representations to the Nevada court touching the circumstances surrounding the execution of the agreement. She did in fact have the independent advice of experienced counsel of her own choosing. There were negotiations over an extended period, during which the several provisions of the separation agreement were molded and remolded. While these negotiations were pending plaintiff was well acquainted with defendant's income and assets. In the course of their almost two decades of married life she had seen her husband rise to a position of some eminence in his chosen legal field. Their standard of living bespoke his large income. There was a large home in a fine residential section, staffed and excellently furnished. Plaintiff had everything that her heart might desire  unlimited charge accounts, fine clothing and hats, jewelry and furs, and she had two Cadillacs at her disposal. With all this *423 went the usual round of entertaining and summer and winter vacations, including a place at the Jersey shore.
At the time of the negotiations plaintiff gave her then attorney a list of her husband's assets, and he was questioned about them before the agreement was executed. She knew that her husband, together with others, owned real estate for investment purposes, and that he had a number of securities. Her brother, a leading Newark manufacturer, was a close and good friend of her husband, and frequently discussed defendant's private and business affairs with him. It was this brother who recommended his own attorney to her in connection with the separation agreement.
Although plaintiff may not have known in complete detail defendant's exact income and every asset, everything points to the fact that she had a fairly accurate and comprehensive knowledge of his earning capacity and worth. For her to say now that defendant "failed to truly disclose his income, property and capital assets at the time the agreement was executed" is disingenuous. The court observed the witness and can place no credence in this branch of her testimony, just as it cannot believe what she had to say about the arrearages she claims are due her under the agreement.
Under the circumstances, this court will not modify the Nevada decree incorporating the support and maintenance provisions for plaintiff set out in the agreement of June 8, 1948. That decree is final, and it fixed defendant's obligations to support plaintiff, past, present and future. New Jersey must recognize the Nevada decree under the full faith and credit clause of the Federal Constitution and reject plaintiff's claim for support in excess of what was provided for in that decree.
It was the plaintiff who sought out the Nevada court for the purpose of obtaining a divorce. She chose her own counsel and paid him herself. Defendant appeared by counsel, answered and contested the jurisdiction of the Nevada court. That court struck down the defense and expressly found as a fact that plaintiff was a bona fide resident of *424 Nevada and that it had jurisdiction over the parties and the subject matter of the cause. The Nevada proceedings may have been nothing more than mere shadow play, the court formalities an empty show of the judicial proprieties, but the decree is entitled to full faith and credit under the cases of Davis v. Davis, 305 U.S. 32, 59 S.Ct. 3, 83 L.Ed. 26 (1938); Williams v. North Carolina, 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279 (1942) and 325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577 (1945); Sherrer v. Sherrer, 334 U.S. 343, 68 S.Ct. 1087, 92 L.Ed. 1429 (1948) and Coe v. Coe, 334 U.S. 378, 68 S.Ct. 1094, 92 L.Ed. 1451 (1948). As was said in Judkins v. Judkins, 22 N.J. Super. 516, 523-525 (Ch. Div. 1952):
"* * * the declared policy of New Jersey must give way to the provisions of the Federal Constitution (Art. IV, sec. 1), that `Full Faith and Credit shall be given in each State to the public Acts, Records, and Judicial Proceedings of every other State.' if the decree of the sister state is of such quality as to entitle it to full faith and credit. * * *
Regardless of the nature of the rights affected by a divorce, or of the local policy of a state in which the full faith and credit effect of a divorce decree of a sister state comes in issue, a decree based upon a finding of domicile and entered in a proceeding in which the defendant appeared and participated, is entitled to full faith and credit. It cannot be impeached by the court of another state on the ground that the court had no jurisdiction for lack of one of the parties, unless it is so impeachable in the state in which the decree was granted. Sherrer v. Sherrer and Coe v. Coe, above. In each of these cases, the defendant spouse appeared personally and was represented by counsel; the Sherrer answer denied and the Coe answer admitted plaintiff's domicile, but the question of domicile was not actually tried in either instance.
The Davis case held, a fortiori, that a divorce decree based upon a finding of domicile made after actual contest and litigation of that issue, is entitled to full faith and credit and may not be subjected to collateral attack in any other state."
The same principle was expounded by Justice (then Judge) Brennan in Whitehead v. Villapiano, 16 N.J. Super. 415 (App. Div. 1951), where he said (at page 422):
"* * * So, where want of jurisdiction over either the person or the subject matter is not shown, the judgment of a sister state cannot be refused the full faith and credit secured by the Federal *425 Constitution merely because the transaction underlying the judgment may offend the public policy of this State; our local policy must give way before the constitutional mandate. Peff v. Peff, 2 N.J. 513 (1949); and see Johnson v. Muelberger, 340 U.S. 581, 71 S.Ct. 474, 95 L.Ed. 552 (1951). The judgment is conclusive in this State on the validity of the cause of action. Fauntleroy v. Lum, 210 U.S. 230, 28 S.Ct. 641, 52 L.Ed. 1039 (1908)."
Cf. Isserman v. Isserman, 11 N.J. 106 (1952); Woodhouse v. Woodhouse, 11 N.J. 225 (1953). Miele v. Miele, 25 N.J. Super. 220 (Ch. Div. 1953), is a case much like this one and held that the Nevada judgment was entitled to full faith and credit in New Jersey, both as to its divorce and alimony features. Staedler v. Staedler, 6 N.J. 380 (1951), relied upon by plaintiff, is clearly distinguishable.
Under Nevada law a divorce decree rendered by its courts is final and cannot be modified. Accordingly, the courts of New Jersey may not do what the Nevada court cannot. This distinguishes the present case from Robison v. Robison, 9 N.J. 288 (1952), which dealt with the proposed revision of a Florida decree and where the Florida court, by statute, retained revisionary powers over its judgments of divorce and support. The same situation does not exist here, for the Nevada court did not reserve jurisdiction to revise its final judgment.
Sweeney v. Sweeney, 42 Nev. 431, 179 P. 638 (Sup. Ct. 1919), is the forerunner of a number of Nevada decisions holding that in the absence of a reservation of jurisdiction and in the absence of a timely appeal, the court loses control over its judgment after the expiration of six months, the period fixed by Rule 45 of Nevada District Court Rules. Schneider v. Second Judicial District Court, 64 Nev. 26, 176 P.2d 797 (Sup. Ct. 1947), specifically approved the Sweeney case and denied relief because the court had completely lost control over its judgment by the passage of time, no reservation of jurisdiction having been contained in the final judgment. The court said that any change in the applicable law would have to come through the Legislature rather than through the courts. This probably accounts for the 1949 change in the Nevada statutes. By an act approved *426 March 17, 1949 (Nev. Comp. Laws, Supp. 1943-1949, sec. 9474.01), the Nevada Legislature specifically provided that judgments for alimony and support could not be modified retrospectively, but only prospectively. But there is no occasion to decide the applicability of this statute to the decree here in question, for it predated the statute. Cf. Whitehead v. Villapiano, 16 N.J. Super. 415, 423 (App. Div. 1951).
The United States Supreme Court had occasion to consider the quality of a Nevada divorce decree incorporating a support agreement in Helvering v. Fuller, 310 U.S. 69, 60 S.Ct. 784, 84 L.Ed. 1082 (1940). The court held that under Nevada law the wife's allowance, once made, is final unless the decree expressly reserves the power to modify, citing Sweeney v. Sweeney, above, to the same effect. And see Lynn v. Lynn, 302 N.Y. 193, 97 N.E.2d 748, 749 (Ct. App. 1951); Goldberg v. Mayer, 243 App. Div. 477, 277 N.Y.S. 799 (App. Div. 1935), affirmed 270 N.Y. 660, 1 N.E.2d 986 (Ct. App. 1936); 3 Nelson, Divorce and Annulment (2d ed. 1945), secs. 33.46, 33.49, pp. 525, 532; 134 A.L.R. 322. Cf. Goodrich v. Harrison, 9 N.J. Super. 382, 387-388 (Ch. Div. 1950).
Applying the Nevada law to the case at bar in the light of the federal mandate to give the Nevada decree the same quality that it possesses in the state of its rendition, there is no alternative but to dismiss every part of the complaint that seeks revision or modification of the agreement insofar as it touches plaintiff's support and maintenance.
As to the applicability of the principles of res judicata and estoppel in circumstances like those present, see Reik v. Reik, 101 N.J. Eq. 523 (Ch. 1927), affirmed 103 N.J. Eq. 23 (E. & A. 1928); 17 Am. Jur., Divorce and Separation, sec. 762, p. 576; 3 Nelson, Divorce and Annulment (2d ed. 1945), sec. 33.48, p. 530.
Although what we have said fully disposes of plaintiff's demand for judgment modifying the separation and property settlement agreement insofar as her own support and maintenance is concerned, passing consideration will be given to *427 plaintiff's claim that she is entitled to such modification under N.J.S. 2A:34-23 (formerly R.S. 2:50-37, as amended), by reason of a change in circumstances since the agreement and Nevada decree of 1948. A review of the testimony shows that there has been no real change in plaintiff's own needs since that time. That she now ruefully recalls former luxuries and pleasures provides no basis for modification, nor does the fact that she presently regards the agreement of June 8, 1948 as one in which she came out somewhat less than second best. If the living standard permitted under that agreement be a rather modest one, it was a standard which she voluntarily and with full knowledge of the circumstances chose for herself. Whether, as was hinted in the course of the trial, her motivation was the appearance of another man on her horizon is not in point; the fact remains that she finally accepted terms which had been the subject of arms'-length negotiation.
There was some attempt made to show that defendant now enjoys a greater income and is possessed of larger assets than before. His circumstances have not changed radically since June 1948, but whether they have or not need not concern us here.
As to whether such improved circumstances may serve as a basis for modifying a previous alimony and support arrangement, see Arnold v. Arnold, 332 Ill. App. 586, 76 N.E.2d 335, 18 A.L.R.2d 1 (App. Ct. 1947). The Illinois law parallels New Jersey's; Ill. Rev. Stat. 1945, c. 40, par. 19, sec. 18, is substantially the same as N.J.S. 2A:34-23, and both states recognize that alimony, especially after divorce, is regulated exclusively through statutory power.
Plaintiff insists that the case of Corbin v. Mathews, 129 N.J. Eq. 549 (E. & A. 1941), supports her challenge of the agreement incorporated in the Nevada decree because of changed circumstances. That decision may be distinguished on several grounds: (1) it does not indicate whether there was a reservation of jurisdiction in the Nevada decree; if there was, then New Jersey was doing nothing more than *428 Nevada could have done; (2) if there was no such reservation, the issue of full faith and credit was not raised or considered; (3) the decisions cited by our court as indicating a general trend toward recognizing revisionary powers because of changed circumstances were all out-of-state cases and none of them was discussed in the light of the federal mandate of full faith and credit; and (4) the Corbin case was decided prior to the current interpretation of the full faith and credit clause, as expounded by the Williams, Coe and Sherrer cases in the United States Supreme Court, and the Whitehead, Woodhouse and other decisions in New Jersey.
We turn now to that part of the complaint which asks for modification of the agreement as it relates to support for the infant children of the marriage. As has already been stated, Joan, the eldest, is now emancipated; Patricia is away at college and Peter is living with his mother in the apartment provided and whose rental is paid for by the father.
Almost all of plaintiff's case was given over to the question of her own support and maintenance. Nonetheless, that part of the judgment demand relating to the children must and will be given consideration.
Although the authorities are in some conflict as to whether a domestic action for support of children of a marriage may be instituted after rendition of a foreign divorce decree providing for such support (27 C.J.S., Divorce, § 329, pages 1286-1287; cf. Moen v. Thompson, 186 Misc. 647, 61 N.Y.S.2d 257 (Sup. Ct. 1946); Yarborough v. Yarborough, 290 U.S. 202, 54 S.Ct. 181, 78 L.Ed. 269, 90 A.L.R. 924 (1933), and dissent of Justices Stone and Cardozo; 17 Am. Jur., Divorce and Separation, sec. 708, p. 537), our Supreme Court seems to have settled the law insofar as New Jersey is concerned in the recent case of Isserman v. Isserman, 11 N.J. 106 (1952). That case dealt primarily with the effect of a Nevada decree upon the question of support and maintenance of a wife who appeared and contested the jurisdiction of the Nevada court. The Supreme Court held that she could not challenge the validity of the Nevada decree in New Jersey because it was entitled *429 to full faith and credit under the Federal Constitution. However, it also held that the Nevada decree was not res judicata as to the child of the marriage who was not made a party to the Nevada proceedings. That child had been a direct participant in support and maintenance proceedings brought in our Court of Chancery, leading to a decree entered some time before the Nevada decree, and had constantly remained a resident of the State of New Jersey. The Isserman case held that that phase of the Chancery maintenance decree providing for support of the child was still effective as to such rights, if any, as the child might have at the moment.
In the present action the children of the marriage had always been residents of New Jersey. They had never departed the State to live elsewhere. They were not made parties to the Nevada proceedings. Except for plaintiff's alleged residence in Nevada during June and July of 1948, the parties have been and continue to be domiciled in New Jersey. Defendant was personally served in this State in the present action. The Nevada decree, therefore, is not res judicata on the question of support for the children, nor is it entitled to full faith and credit here. Cf. Goodman v. Goodman, 15 N.J. Misc. 716 (Ch. 1937).
There is, however, nothing to show that there has been such a change of circumstances that more than $25 a week need be paid by the defendant to plaintiff for the support of any child while that child resides with her. Defendant is personally paying for the college education of his daughter Patricia, as he had for Joan. He has provided adequately for his children's clothing needs and paid such medical and dental bills as were properly chargeable to him. He has done what the agreement requires him to do, and perhaps more. The mother may not improve her own situation by asking for increased sums for Patricia and Peter where the circumstances do not establish the need for more than $25 per week each for support and maintenance.
The schedule attached to the complaint lists various sums claimed to be due plaintiff under the terms of the *430 June 8, 1948 agreement. These were testified to in some detail. The several items may be broken down into four groups:
(a) Alimony and support for plaintiff, Patricia and Peter for the five weeks from October 21, 1951 to November 24, 1951, inclusive, at $105 per week, or a total of $525. Plaintiff admits that the $105 for the last week, from November 18 to November 24, 1951, inclusive, has been paid. The court finds that defendant paid the remaining $420 by paying for certain photographic equipment purchased by plaintiff for her son-in-law, totaling $225.57, and giving plaintiff a check for the balance of $194.43, which check is still in her possession.
(b) Bills incurred for Joan and paid by plaintiff, totaling $1530.89. The first five items in this group  shoes $26.90, medicine $14, wearing apparel $419.76, board while Joan was home from Smith College for the summer of 1950, $400, and board for Joan during November 1949 and April 1950 when she was home for the Thanksgiving and Easter holidays, $175  together with a $250 item representing tuition at Columbia High School for Patricia for the 1949-50 school year, and three small items for doctors for Peter, amounting to $8, $10 and $20.75, were among the claims presented on plaintiff's behalf by her then attorney in a letter he wrote defendant's attorney on March 21, 1951. These were finally compromised for $550, represented by a check sent to plaintiff's attorney on April 11, 1951 "in full payment and in complete release of all claims * * * to date." The understanding was that the check was not to be used until plaintiff produced a receipt for $250 which she claimed, and still claims, she paid for Patricia's tuition fee at Columbia High School. (Defendant has insisted throughout that he paid the tuition item, and was able to produce receipts at the trial for three of the four quarters of the school year.) Plaintiff was unable to produce the requested receipt; consequently, the $550 check was returned and a $300 check delivered in its stead. Plaintiff cashed this check, thus indicating her apparent willingness to accept the settlement. *431 Nowhere in her schedule of claims does the plaintiff allow credit for this $300 payment. At best, defendant owes plaintiff an additional $100 in connection with this settlement, because in one of the letters which passed between the attorneys, plaintiff's attorney said that he assumed that acceptance of the $550 check did not mean that the defendant would not pay the $100 he had offered in compromise of the $400 claim for Joan's board. Further proof that the settlement was accepted by plaintiff is afforded by the fact that a few weeks later her attorney wrote requesting payment of $445 arrearages that had accumulated in the meantime. Nothing was said then or, in fact, until this action was begun at the close of 1951, about payment of any claim included in the compromise.
Defendant disputes plaintiff's remaining claims for payments allegedly made on Joan's behalf. These represent purchases of shoes and clothes, and a dry cleaning bill. They are not supported by individual bills showing specifically for whom the clothing was purchased or the dry cleaning done. The proofs are persuasive that in the case of Joan, as in the case of the other children, defendant paid for such apparel as they required. Plaintiff has not sustained the burden of proof of establishing these arrearages.
It may, incidentally, be recalled that under the agreement of June 8, 1948 plaintiff agreed that she would under no circumstances purchase any goods or merchandise on the credit of defendant, and would hold him harmless from any liability for such purchases.
(c) Bills incurred for Patricia and paid by plaintiff, totaling $671.40. The first of these items is for high school tuition for the school year 1949-50, amounting to $250, and which figured in the compromise settlement already mentioned. A second tuition item, for the school year 1950-51, for $275, is disputed by defendant who claims he never authorized it. At the time the bill was incurred Patricia was living with her mother in East Orange; nonetheless, plaintiff insisted upon sending her to Columbia High School in South Orange. Defendant chose not to reimburse plaintiff *432 for this unauthorized expenditure and under the terms of the agreement, he need not. He did, however, volunteer payment for the first semester of the 1951-52 school year, this being Patricia's senior year at Columbia High. Defendant's check for that amount was produced at the trial, but the item is nonetheless set out in plaintiff's schedule of claims.
The remaining claims are for clothes purchased for Patricia. There is no proof to support them.
(d) Claims for payments made on behalf of Peter, totaling $71.25. Of this sum, $38.75 was included in the settlement already mentioned. Defendant admits that the two items making up the balance of $32.50 are owing plaintiff.
(e) Finally, plaintiff claims $375, representing arrearages in the $25-a-week support for each child during the summer of 1951. These are disputed by the defendant, who testified that payments were withheld because the children were away from plaintiff's home on vacation during the several weeks in question. Reference to the various checks issued by the defendant to plaintiff during that summer support his explanation.
In addition to the items set out in the schedule, plaintiff makes claim for nurses' bills incurred when Peter was injured and had to be hospitalized during the latter part of 1952, as well as for his tuition at the Carteret School in West Orange. These items, among others, were involved in a motion to hold defendant in contempt for wilful refusal to comply with a court order advised on March 24, 1952, directing him to make payments in accordance with the settlement agreement. The application was denied on December 12, 1952, the advisory master finding that defendant was not in contempt. That order is dispositive of the nurses' and Carteret School bills.
Accordingly, defendant owes plaintiff only $132.50.
Plaintiff's attorney has already received a $350 counsel fee pendente lite. There will be a further allowance of $350. Judgment in accordance with the views here expressed should be presented within ten days.