LOUIS SCHLESINGER COMPANY, a
corporation of New Jersey,
Plaintiff,

v.

The KRESGE FOUNDATION, a Michigan
corporation, and Kresge Department
Store, Inc., a Delaware corporation, Defendants.

Civ. A. No. 932–64.

United States District Court,
D. New Jersey.

March 10, 1970.

Greenbaum & Greenbaum, by Robert S. Greenbaum, Newark, for plaintiff.

McCarter & English, by Julius B. Poppinga, Newark, for defendants.

## OPINION

WORTENDYKE, District Judge:

This case was the subject of cross-motions for summary judgment upon which the United States District Court for the District of New Jersey, granted the defendant's motion and denied plaintiff's motion. Louis Schlesinger Company v. Kresge Foundation, 260 F.Supp. 763 (N.J.D.C.1966). Plaintiff, Louis Schlesinger Company, appealed and the United States Court of Appeals, Third Circuit, reversed and remanded. Louis Schlesinger Company v. Kresge Foundation, 388 F.2d 208 (3 Cir. 1968). Pursuant to the remand, the case proceeded to trial on September 29 and 30 and October 1 and 2, 1969. By special leave of Court on the application of the plaintiff, a post-trial deposition was taken in Detroit, Michigan, on October 14, 1969 and the transcript submitted to the Court in lieu of the appearance in Court and oral testimony of the deponent.

Plaintiff, Louis Schlesinger Company, is referred to herein as plaintiff or broker, and defendant, The Kresge Foundation, as defendant or Kresge. References to the transcripts of testimony taken during the trial are by volume and page.

The Third Circuit Court of Appeals, in the course of its Opinion, made the following observations:

"What seems to be a question of law as to the right of a broker to additional compensation on the renewal or extension of the lease for which he was the procuring agent is a matter which is not free from difficulty. It is brought to the courts most frequently where the subsequent conduct of the owner and tenant is molded in a form which does not on its face establish liability for additional commission. It is evident in such cases that the interest of the parties to the lease lies in avoiding the obligation to pay additional commission and from this arises at once the factual question whether what is otherwise described by the owner and lessee is in reality a transaction which falls within the language of the real estate broker's contract with the owner. Here the circumstances which surrounded the making of the new lease which terminated the original lease must be considered in making the factual determination whether the new lease fell within rule (e) of the Detroit Real Estate Board. The determination of this question requires consideration of the intention of the parties as derived from their conduct, and the inferences which are to be drawn from their intention."

The Circuit Court, in commenting upon the issue of enforceability of the Commission Agreement by reason of the acts of broker in the State of Michigan where broker was not licensed, said:

"This question is entangled in the precise details of the broker's activities and where they occurred, and therefore the factual circumstances will lend their coloration to the legal question which may require decision."

The above-quoted observations of the Circuit Court bring into focus the following factual issues:

1. Why did the parties incorporate the Detroit Real Estate Board rates and rules in their Commission Agreement?

2. Did the new lease arrangement between Kresge and Western Electric by reason of which broker claimed an additional commission represent a bona fide renegotiation of the landlord-tenant relationship so that it did not fall within the terms of Kresge's Commission Agreement with broker?

3. Did broker engage in significant activities in Michigan, which, by reason of the fact that broker was not licensed in Michigan, were illegal?

## FINDINGS OF FACT

*Facts Establishing The Intent Of The Commission Agreement*

Plaintiff's claim is founded upon a Commission Agreement dated December 12, 1956 [P–9]. It incorporates by reference the rates and rules of the Detroit (Michigan) Real Estate Board [P–13].

Broker brought Western Electric Company to the attention of Kresge by a telephone call from Newark to Detroit on December 14, 1955 [Vol. I p. 12] which was confirmed by letter of the same date [P–1]. The telephone call to Kresge was made on the initiative of Mr. Katz, Vice President of broker. He had not been asked by Kresge to find a

tenant [Vol. I p. 17]. Instead, Mr. Katz had determined that Western Electric (whom he described in his testimony as "my customer") needed office space in downtown Newark and acting upon rumor, instituted the approach to Kresge [Vol. I p. 18]. Throughout 1956, Mr. Katz made inquiries on behalf of Western Electric for space other than the Kresge building in Newark [Vol. I pp. 64–65]. Mr. Katz testified that from December, 1955 through July 26, 1956 all that was done by broker with respect to the Kresge-Western Electric matter was "phone calls back and forth" [Vol. I p. 67]. Actually, Mr. Katz had a record of only one telephone call during this period which was on July 19, 1956 [Vol. I p. 69] and in any event, testified that such conversations as did take place "* * * were just general inquiries as to what was happening." [Vol. I p. 70]. On August 8, 1956 Mr. Katz wrote to Kresge outlining more exactly the requirement of his customer, Western Electric [Vol. I p. 18 and P–4]. Kresge's reply of August 10, 1956 [P–5] advised "* * * that any present negotiations with the Western Electric Company would be fruitless." On August 21, 1956 Mr. Katz called on Mr. Guerrieri, the manager of the Kresge Department Store in Newark [Vol. I pp. 70–71] who, however, expressed his feeling that he was not interested in the idea of making space for Western Electric in the store [Vol. I p. 71]. In fact, the impression left on Mr. Katz was that he had been "thrown out" [Vol. I p. 73].

Undaunted by the lack of encouragement from Kresge, Mr. Katz flew to Detroit, Michigan, on October 9, 1956 and went to the Kresge offices there [Vol. I p. 73]. This was his first personal contact with the Kresge people. He was the one who was handling the matter for broker [Vol. I pp. 73–74]. On this visit, he outlined the requirements of Western Electric, advised Kresge that he thought he could definitely produce a deal on two floors, that Western Electric was interested in a five year lease with five one-year options, suggested the

square foot rental and discussed the use to which the space would be put [Vol. I pp. 73–75].

About a week later, Mr. Katz again traveled to Detroit, Michigan, this time in the company of Mr. Marion [Vol. I p. 78], of Western Electric [Vol. I p. 28]. The meeting with the Kresge people on this occasion lasted several hours [Vol. I p. 80]. Mr. Katz introduced Mr. Marion as a representative of Western Electric, stated his purpose for being there, advised that he was there to try to reach a meeting of the minds and again advised Kresge that Western Electric was interested in space at $3.00 a square foot, but Kresge wanted $4.00 a square foot and was interested in a 10 year lease [Vol. I p. 81]. Following the meeting, Mr. Katz and Mr. Marion stayed overnight in Detroit [Vol. I p. 83]. After further discussion of the negotiations, Mr. Katz telephoned Kresge again in further efforts to close the gap on the rental figure before returning to New Jersey [Vol. I pp. 83–86]. From at least November 8, 1956 onward, Mr. Katz stayed completely out of the negotiations [Vol. I p. 86].

Under date of February 15, 1957, Kresge, as lessor, and Western Electric Company (hereinafter Western Electric), as lessee, entered into a Lease Agreement (hereinafter the 1957 Lease) for the eighth and ninth floors of the building at 715 Broad Street, Newark, New Jersey [P–10]. The term of the 1957 Lease was "* * * a period of ten (10) years commencing on the date of delivery * * *" of the first portion of the demised premises [P–10 Par. 1]. The 1957 Lease set forth a staggered schedule of delivery of the demised premises and provided that prior to complete possession by the lessee, rent would be paid on a square foot basis for the space delivered [P–10 Pars. 1 and 2]. The 1957 Lease was terminable at the option of the lessee at the end of the sixth year of the original term or at the end of each subsequent year of the original term subject to the payment, as rent, of amounts determined by the time

of termination, but in any event less than the full rent for the balance of the 10 year term [P–10 Par. 11a].

It is apparent from the foregoing that broker volunteered its services to Kresge, without any request by Kresge, and solely to accommodate broker's customer, Western Electric. It is also apparent that the precise amount of rental to be paid under the 1957 Lease was not determinable in advance. Accordingly, it is not surprising that the commission to be paid to broker became the subject of negotiation before the signing of the 1957 Lease.

Broker commenced negotiations for the Commission Agreement while in Detroit on the 9th and 15th of October, 1956 [Vol. I p. 87]. These negotiations eventually resulted in a letter agreement [P–9] dated December 12, 1956 [Vol. I p. 87] (referred to herein as the Commission Agreement). Under date of March 13, 1957, broker submitted a statement to Kresge "In accordance with Agreement dated December 12, 1956" [Vol. I p. 188 and D–7]. Under date of April 12, 1957, Kresge remitted the sum of $81,552.27 to broker "* * * in full payment for your services rendered in connection with the [1957 Lease] * * *" [P–11]. Broker accepted said payment and took no exception to P–11, Kresge's cover letter [Vol. I pp. 189–190].

The present dispute arose out of broker's contention that a further commission was due under the Commission Agreement, not in respect of the initial lease transaction, but because of a subsequent transaction between Kresge (or its grantee), as lessor, and Western Electric, as lessee, involving the eighth and ninth floors of the Kresge building which floors were the subject of the 1957 Lease and, in addition, the fifth, sixth, and seventh floors in the same building.

Plaintiff's claim requires, at the very outset, a factual determination as to whether the Commission Agreement was intended to relate to any commission other than the $81,552.27 which

was paid in 1957. The burden of proof would be upon plaintiff to show that the Commission Agreement was intended to relate to renewals and the taking of additional space. This burden was not sustained and, in fact, the evidence is to the contrary. The Commission Agreement [P-9] provides that broker would accept and Kresge would pay "the real estate commission in accordance with the [Detroit] rates and rules * * * said commission to be due and payable upon execution of the lease." But for the ambiguity introduced by the incorporation of the Detroit rates and rules (and the reference in Rule (e) thereof to commissions on renewals and upon the taking of additional space, this language would appear to refer to just one commission, i. e. that one which was payable upon execution of the 1957 Lease and which was in fact paid as recited above. Because of this ambiguity, all the facts and circumstances surrounding the execution of the Commission Agreement are properly considered. The following extrinsic evidence appears:

1. In 1956, before the 1957 Lease was signed, broker first sought a commission based on the *Newark rates* [Vol. I pp. 137–139] which would have produced a commission on the 10 year lease of about $172,000 as against about $81,000 under the Detroit rates [Vol. I p. 152]. Kresge rejected this [D–16].

2. At a meeting in Newark on December 11, 1956, Mr. Howard Baldwin of Kresge proposed that the Detroit rates be used [Vol. I p. 144] which he believed produced a figure of $65,000 [Vol. I pp. 105 and 112]. After Mr. Baldwin left broker's office, broker, by checking a booklet complete as to the Detroit *rates*, discovered that they produced a figure of $81,000 [Vol. I pp. 112–114]. Without advising Mr. Baldwin of the discrepancy between this figure and $65,000 [Vol. I p. 114], broker telephoned Mr. Baldwin in Newark advising him that broker would accept its commission in accordance with the rates and rules of the Detroit Board [Vol. I p.

108]. Thereupon, broker prepared the first version [P-8] of the letter agreement which was hand-carried to Mr. Baldwin the next morning [Vol. I p. 114]. On December 13, after having returned to Detroit, Mr. Baldwin discovered the error and the differential between $65,000 and $81,000 and informed broker of it by telephone [Vol. I p. 115]. However, the Commission Agreement was finally signed and prepared by broker with a slight revision made by broker at the suggestion of Mr. Baldwin [Vol. I p. 181]. The revision was discussed on December 28 [Vol. I p. 181], and incorporated into P–9 which was forwarded to Michigan by broker [Vol. I p. 121 and P–14], and then returned, after having been signed by Kresge, under cover of letter dated December 31, 1956 [Vol. I p. 90 and P–15].

Despite some testimony by Mr. Katz [Vol. I pp. 138, 139 and 143] and by Mr. Schlesinger [Vol. I p. 171] to the effect that the question of commissions on renewals beyond the 10 year term and on the taking of additional space was discussed in the negotiations which concluded on December 28, 1956 and resulted in the Commission Agreement [P–9], there are several memoranda which Mr. Katz prepared contemporaneously with the negotiations and in none of them is there any reference to any discussions whatever respecting commissions on renewals or on the taking of additional space [D–2, D–6 and diary entry of December 11, 1956, Vol. I p. 105]. The same is true with respect to contemporaneous memoranda prepared by Mr. Schlesinger [D–3, D–4 and D–5 and Vol. I pp. 107, 109, 110, 112, 115–117, and 124–125]. This is particularly significant in light of Mr. Katz' testimony that he was very careful to record telephone conversations in his dealings with Kresge because it involved a commission without a clear-cut authorization [Vol. I pp. 59, 102–103]. Mr. Schlesinger was also a careful memorandum writer and recorded "everything" [Vol. I p. 185]. Not only are the contemporaneous memoranda of Messrs. Katz and Schlesinger

devoid of references to any commission payments on renewals or extensions of lease, but Mr. Katz himself testified on redirect examination as follows:

"Q. Did the discussion that you and Mr. Schlesinger had with Mr. Baldwin primarily concern then the concept, either the concept of commissions on renewals, taking of additional space or extensions or, on the other hand, the amount of the commission that would be paid on the February 15, 1957 lease?

A. The discussion involved only the commission that was to be paid on the original part of the lease. That was the only concentration that was made by Mr. Baldwin was trying to reduce [sic]—

THE COURT: Just a minute. When you say original part of the lease, what do you mean?

THE WITNESS: The original, the aggregate rental of the original term of the lease of ten years, that's right, your Honor. There was a discussion, an effort on Mr. Baldwin's part to reduce our just commission, and he was concerned with reducing the initial payment to me." [Vol. I pp. 143–144]

Mr. Schlesinger's testimony likewise conveys the impression that Mr. Baldwin's concern was with the *rate* and *amount* of commission to be paid on the original lease [Vol. I pp. 170–171].

3. The telephone message on December 11, 1956 from broker to Mr. Baldwin advising that broker would accept its commission in accordance with the Detroit Real Estate Board's rates and rules [Vol. I p. 108] was made following reference to the *rates,* but broker did not receive a complete copy of the *rules* and *regulations* until two days later [Vol. I p. 113]. There is no testimony establishing that broker knew on December 11, 1956 of the possible effect of Detroit Rule (e). [See item 8 below].

4. Some of the testimony of Messrs. Katz and Schlesinger could be interpreted to mean that Kresge tacitly accepted an agreement requiring payment of further commissions on renewals or on the taking of additional space [Vol. I pp. 138–140], but this is inconsistent with the remittance of more than $81,000 by Kresge "* * * in full payment for your services rendered in connection with the [1957 Lease] * * *" [P–11]. As stated above, broker took no exception to the remittance so made [Vol. I pp. 180–190].

5. A contemporaneous letter prepared by Mr. Howard Baldwin on December 7, 1956 to Sebastian S. Kresge, a trustee of The Kresge Foundation [D–16], is also irreconcilable with the position that Kresge could incur any further commission obligation to broker beyond that incurred at the time the 1957 Lease was executed.

6. The only record of discussion of commission on the exercise of an option of any kind had to do with the option under the 1957 Lease to cancel at the end of six years [Vol. I pp. 289 and 290 and Gregory notes (D–28)]. Further, Mr. Gregory testified as follows:

"Q. Do you recall ever having discussed with Mr. Baldwin in the year 1956 or prior thereto whether or not there would be any commission liability to the Louis Schlesinger Company on the Western Electric lease in the event of any extension or renewals thereof?

A. I understood the commission paid at that time was the whole, everything.

MR. GREENBAUM: Please read my question to Mr. Gregory.

"(The Reporter reads back the pending question.)

A. I understood there would not be any further liability or any further claim for commission.

**1018**

Q. Mr. Gregory, I asked you whether or not you recall any discussions with Mr. Howard Baldwin as to the possibility of a liability on the Foundation for commissions to the Louis Schlesinger Company in the event of renewals or extensions of the Western Electric lease. Now, I would like to know if you recall such discussions specifically on that subject. I am asking from your knowledge of the facts, did such discussions take place?

A. Yes.

Q. Now, I would like to know what those discussions were. This is in the year 1956, not later, but '56 or prior thereto. I would like to know what discussions there were and when they were with Mr. Howard Baldwin?

A. He indicated to me that it was his understanding in negotiating the agreement with Schlesinger that the settlement, the $81,000—plus that was paid in commissions, was the full, final, complete settlement.

Q. I invite your attention, Mr. Gregory, to the fact that the commission was paid in April of 1957.

A. Right.

Q. I am not focusing my question with respect to any conversations you may have had at or about that time in the year 1957. I am talking now up to the time that the commission agreement was signed and returned to the Louis Schlesinger Company, which was at the end of December, 1956.

A. Yes. That is what I am referring to also, the agreement, the letter that Schlesinger sent on to Mr. Howard Baldwin, and he signed it on behalf of the Foundation. I understood that the commission that would be paid under that agreement which was paid in the early part of next year—you say in April—that $81,000—plus was in full, complete settlement of any claim or fee under that lease." [Vol. I pp. 295–297].

(It should be noted that Mr. Howard Baldwin was a trustee of The Kresge Foundation in 1957 and he died on June 26, 1963, before this litigation arose and hence was not available to testify on deposition or otherwise [Vol. I pp. 238–239].) Exhibit P–26 is further evidence of Kresge's understanding of the intended scope of the Commission Agreement.

7. Mr. Gregory further testified that he had the Detroit rates but that he did not read the Detroit rules and that he did not recall any discussions with Mr. Howard Baldwin relating to the Detroit rules concerning commission to brokers for renewals and extensions of leases [Vol. I p. 300]. This further supports the inference that the Commission Agreement dated December 12, 1956 was not entered into on an understanding that the incorporation of the Detroit rates and rules could give rise to any future commission obligation.

8. As of December 31, 1956, when the Commission Agreement between Kresge and broker was consummated, the 1957 Lease to which the Commission Agreement related had not yet been finally negotiated and, indeed, was not signed until on or after February 15, 1957. There is nothing in the record to indicate that broker had knowlege of any option to renew or of any right to take additional space under the contemplated lease at the time the Commission Agreement was being negotiated.

The Court finds, therefore, from all the circumstances surrounding the negotiation and execution of the Commission Agreement, that it was intended by the parties to relate only to the commission which was paid in April of 1957 in the amount of $81,552.27. The determination of that figure involved both the application of the Detroit rates and the application of Detroit Rule (f) which

awarded to the broker compensation based upon the full term of the lease notwithstanding the early cancellation clause contained in the 1957 Lease [P–10 Par. 11a].

*Facts Pertaining To Whether Lessee Availed Itself Of Privilege Of Renewal Under Provisions Of Original Lease*

■ Even if it was clearly the intent of Kresge and broker that a further commission would be payable upon the occurrence of the events and existence of the conditions described in Rule (e) of the Detroit rates and rules, plaintiff has proved neither the occurrence of such events nor the existence of such conditions. Rule (e) reads as follows:

"(e) Where lessee avails himself of privilege of renewal or extension of lease, or takes on additional space under provisions of original lease, the negotiating broker shall be entitled to additional compensation at same rates as applied to original case, when and as said lessee avails himself of such privileges." [D–27]

Because of the references in Rule (e) to the provisions of the original lease, it must be read in conjunction with the pertinent part of the 1957 Lease, namely, paragraph 3, reading as follows:

"3. The Lessee shall have the option to renew this lease for an additional period of five years upon the same terms and conditions upon written notice thereof sent to the Lessor at 2727 Second Boulevard, Detroit, Michigan, at least nine (9) months prior to the expiration of the term of this lease. The Lessor shall offer first to the Lessee, which shall have the right of first refusal, to rent any other space in the building, and available for leasing, of which the demised space is a part, which may become vacant during the term of this lease, at a rental to be

agreed upon by the parties. The Lessor's offer shall be in writing and must be accepted by the Lessee by notice in writing to the Lessor within thirty (30) days after receipt of said offer." [D–27]

■ The Court finds that paragraph 3 of the 1957 Lease did grant Western Electric, as lessee, an option to renew with respect to floors eight and nine, but only "upon the same terms and conditions." A new lease was entered into between Kresge and Western Electric under date of June 9, 1964. The Appendix hereto sets out a comparison of the terms of the 1957 Lease, if it had been renewed on the same terms and conditions, and the actual terms of the new lease dated June 9, 1964. These comparisons were the subject of the testimony of Mr. Lyne [Vol. I pp. 387–395]. The differences are numerous and substantial, going to such basic matters as rental rate, renewal privileges, tax escalation provisions, renovation payments, heating and air conditioning requirements and relative rights of tenant and landlord in case of condemnation and fire.

■ Moreover, instead of renewing the 1957 Lease, it was foreshortened by three years and superseded by the June 9, 1964 lease executed by the parties on September 8 and September 14, 1964, respectively [P–18]. (It should be noted that there is an earlier lease document also dated June 9, 1964 [P–17].) The earlier document contained contingencies which were not met even as of September 14 when the second June 9, 1964 lease was executed [Vol. I pp. 349–350]. Mr. Lyne testified as to extensive further negotiations after the first June 9 lease was executed [Vol. I pp. 351–360 and 417] and that at the insistence of Western Electric, a whole new lease was signed [Vol. I pp. 359–360]. The earlier June 9, 1964 document was returned to Western Electric for destruction [Vol. I pp. 367 and 412]. The Court finds that the document marked P–18, the June 9 lease executed in September, superseded P–17, the June 9 lease executed in June,

and that P–18 is the sole basis for plaintiff's claim [Vol. II p. 71].

Mr. Bardi testified that Western Electric became interested in a new lease arrangement upon a decision being made to effect a relocation and reorganization of its facilities giving rise to the need for approximately 250,000 square feet of centralized space [Vol. I p. 306]. He said that floors eight and nine of the Kresge building theretofore occupied by Western Electric were not satisfactory as they existed for the new purpose [Vol. I p. 482] and testified at length as to the changes required to be made on floors eight and nine and in the "entire backup support of the building" in order to adapt the space to Western Electric's anticipated needs [Vol. I pp. 312–315].

■ He further testified, "We negotiated the entire space as a new full package * * *" [Vol. I p. 324]. The Court, therefore, finds that the June 9, 1964 lease [P–18] does not constitute the exercise of a "privilege of renewal or extension of lease * * * under provisions of original lease" as that phrase is used in Detroit Rule (e), nor does it constitute the exercise of an "option to renew * * * upon the same terms and conditions" as that phrase is used in paragraph 3 of the 1957 Lease. Both must be proved to give rise to any further commission rights on renewal.

This finding of the Court is buttressed by, but independent of the testimony of Eldon K. Andrews, who appeared as an expert witness for defendant. Mr. Andrews heads a substantial real estate firm in Detroit, Michigan [Vol. II p. 2], has been a licensed broker of that State since 1960, and for two or three years prior to that time, was a real estate salesman in Michigan [Vol. II pp. 28–29]. He was President of the Detroit Real Estate Board [Vol. II p. 3], and served on a committee which reviewed the Detroit rates and rules in connection with a revision in 1958 [Vol. II p. 30]. He testified that he had occasion in more than 100 instances to consider the application of Rule (e) in the computation of broker's commissions in situations involving the exercise of a privilege to renew [Vol. II p. 5]. He testified that on the basis of his experience as a broker in the Detroit area he was aware of a customary construction given to that portion of Rule (e) which pertains to the exercise of a privilege for renewal [Vol. II pp. 10–12] and stated that under Rule (e) no commission would accrue to a broker who negotiated the original lease where, even though there was a renewal option, the parties entered into bona fide negotiations which resulted in the kinds of changes that are reflected in the June 9, 1964 lease [Vol. II pp. 11–18]. He testified that only where there is no new negotiation would a broker be entitled to a further commission under Rule (e) upon the exercise of a renewal option [Vol. II pp. 54–55]. He testified that when there is injected a negotiated change or an element of negotiation, then there is no exercise of an option which would, under Rule (e), give rise to a further commission to the broker who produced the original lease [Vol. II pp. 60–61].

Although plaintiff produced a Detroit realtor who denied the existence of a prevailing custom [Vol. III p. 25] he was apparently confused by what counsel meant by custom [Vol. III p. 24]. He said that there is no custom other than the rule in the book [Vol. III p. 27] but conceded that he did not know of anyone who put a different interpretation on Rule (e) than the interpretation which he himself put on it [Vol. III p. 29]. Thus, the testimony of defendant's expert stands uncontradicted as to the nature of the custom and supported as to the existence of the custom.

*Facts Pertaining To Whether Lessee Availed Itself Of Privilege Of Taking Additional Space Under Provisions Of Original Lease*

■ The Court finds from an examination of paragraph 3 of the 1957 Lease [P–10 and D–27] that Western Electric did *not* have a privilege of taking additional space under provisions of the 1957

Lease. The pertinent language in the 1957 Lease reads as follows:

"The Lessor shall offer first to the Lessee, which shall have the right of first refusal, to rent any other space in the building, and available for leasing of which the demised space is a part, which may become vacant during the term of this lease, at a rental to be agreed upon by the parties. The Lessor's offer shall be in writing and must be accepted by the Lessee by notice in writing to the Lessor within thirty (30) days after receipt of said offer." [D-27]

■ The most significant element of the bargain, the rental, being left to be agreed upon, the Lessee's right is at best a right to negotiate for additional space. The additional space provisions of Detroit Rule (e) therefore have no application here.

■ The Court further finds from the evidence referred to above that floors five, six and seven, which were included in the June 9, 1964 lease, were not taken "under provisions of original lease" [Rule (e)], but on entirely different terms and conditions than were contained in the 1957 Lease. [See Appendix] This finding is also supported by, but is made independent of, the testimony of defendant's expert. He testified that he had had occasion personally to consider more than 50 times the computation of commission to brokers under Detroit Rule (e) upon the exercise by a tenant of the privilege to take on additional space under the provisions of the original lease [Vol. II pp. 5–6]. He stated that the significance of the words "under provisions of original lease" as used in Rule (e) was, in his experience, as follows:

"A. The provisions of the original lease are supposed to spell out in detail how the exercise of option, or the additional space is to be made; on what conditions it is to be made, and the rental rate. This rule was written. I can give you an example of it very easily.

Q. Please do.

A. Pardon?

Q. Please do.

A. At lease three thousand square feet of office space in the Penobscot Building, if I had an option on my lease to take over an additional one thousand feet adjoining my space, and it became available during my five year lease, then when that space is available, in the lease, it would spell out I would continue my five fifty rate on that additional space, and if it was available. That's the way the options are normally written for increasing the space to an original lease.

Q. In other words, if the lease were regarded, the existing document regarded as an umbrella, you are just spreading the umbrella, is that correct?

A. That's correct.

Q. Mr. Andrews, suppose that when it came to the point of taking the additional space, there were no provisions in the existing lease as to what the rental should be on the additional space?

A. I would have no option. I would have no privilege in the original lease.

Q. And would you have no privilege within the meaning of Rule E?

A. That's correct.

Q. Hence, no commission?

A. That's correct.

Q. Under Rule E.

A. That's correct." [Vol. II pp. 13–14]

His testimony continued:

"Q. Mr. Andrews, if the original lease requires the landlord to inform the tenant, should there be additional space available for leasing, but if the original lease

does not fix the rental at which that additional space may be taken by the tenant, does that constitute a privilege for taking additional space under terms of the original lease as that phrase is used in the Detroit Rule E?" [Vol. II p. 20]

THE WITNESS: The answer would be no. It would not grant a privilege unless the terms of the expansion were spelled out." [Vol. II p. 21]

The following must also be considered. The very limited privileges respecting additional space under paragraph 3 of the 1957 Lease relates only to space which may "become vacant" and "available for leasing" during the term of the lease [D–27]. The Court finds that floors five, six, and seven did not become vacant and available for leasing but rather were vacated and made available especially for Western Electric. Those floors were part of the premises leased by The Kresge Foundation to Kresge-Newark, Inc., the department store business, for a term expiring April 30, 1967 [Vol. I pp. 239–240 and D–9]. The lease was not subject to cancellation by the landlord without cause [Vol. I pp. 240–241]. As of March 17, 1964, when serious negotiations began between Kresge and Western Electric respecting floors five, six, and seven and the renovation of floors eight and nine, there was not any unoccupied space in the Kresge building. Western Electric occupied floors eight and nine and the department store business occupied all the rest [Vol. I p. 244]. On June 1, 1964 all the stock of Kresge-Newark, Inc., the department store business, was acquired by Chase-Newark Corporation, a Delaware corporation, wholly owned by David T. Chase [Vol. I p. 348]. Mr. Chase had, by agreement dated April 27, 1964 [P–19], agreed to purchase said stock, the land and building known as 715 Broad Street, the lease between The Kresge Foundation and Kresge-Newark, Inc., and the 1957 Lease between The Kresge Foundation and Western Electric

[Vol. I p. 333]. As of June 1, 1969 there was not any empty space in the building [Vol. I p. 348], and as of September 14, when the June 9, 1964 lease which is the basis for plaintiff's claim was finally fully executed, the lease between Chase Department Store, Inc. (formerly Kresge-Newark, Inc. [Vol. I p. 347]) and The Kresge Foundation was still in force and effect [Vol. I p. 350]. It was not terminated until October 1, 1964 when Chase-Newark Corporation obtained title to the 715 Broad Street premises from The Kresge Foundation [Vol. I pp. 350–351]. This was done in order to permit consummation of the transaction with Western Electric respecting floors five, six, and seven [Vol. I pp. 368, 374–375].

As to the foregoing, Mr. Gregory testified:

"We simply had two tenants in the building, Western Electric and Kresge Newark. Therefore, any expansion of space so far as Western Electric was concerned would mean the reduction of space by the other tenant, namely, Kresge Newark, Inc. so that the two had to be worked together.

Q. [By Mr. Greenbaum] I understand. What is confusing about my question now? I understand that during such period of time as the space in the building not occupied by Western Electric was occupied by the department store, the Foundation negotiated with and sought to have Western Electric agree to take additional space in the building which would be made available by contraction of the store. Is that correct?

A. That's right.

Q. During that period of time while such negotiations were pending and from the time that Western Electric first went into the building, did the Kresge Foundation seek to have any of the space not occupied by Western Electric leased to any prospec-

tive tenant other than Western Electric in the department store?

A. To that my answer would be no.

Q. In connection with the disposal of the business, did the Foundation attempt to rent the space occupied by the operating store, Kresge Newark?

A. Yes." [Vol. I pp. 302–303].

There is yet an additional reason why broker cannot establish a claim with respect to the taking of additional space pursuant to the provisions of the original lease. As quoted above, paragraph 3 of the 1957 Lease requires the exercise of the limited right of first refusal which Western Electric had by notice in writing within 30 days after receipt of the offer [D–27]. Mr. William Baldwin approached Western Electric on behalf of Kresge on November 21, 1963 and said, " * * * that anything from the sale of the building on down would be considered and would be made attractive to them." [Vol. I p. 232]. Mr. Bardi of Western Electric testified that Mr. Baldwin made it known to him at that time that Kresge was " * * * willing to condense the store and make available to Western Electric additional space if we so desire." [Vol. I pp. 308 and 326]. The next day Mr. Baldwin wrote to Western Electric to make a record of his visit of the prior day [D–10]. Under date of December 16, 1963, Western Electric advised Kresge, in writing, that it was not interested [D–11]. While it is true that Mr. Baldwin made his approach to Western Electric without being conscious of the provisions of paragraph 3 of the 1957 Lease [Vol. I pp. 231–232], nevertheless, the Court is satisfied that following the receipt of D–11, Western Electric's right to negotiate for additional space under paragraph 3 of the 1957 Lease was exhausted.

*Plaintiff Has Adduced No Proof Suggesting The June 9, 1964 Lease Transaction Was Molded By The Parties With An Intent To Avoid A Commission Obligation*

There is not any proof whatever suggesting that the parties to the June 9, 1964 lease transaction molded their agreement so that it would not fall within Rule (e) of the Detroit Real Estate Board and the provisions of paragraph 3 of the 1957 Lease. The evidence establishes beyond question that the June 9, 1964 lease was the result of complex and protracted arms-length negotiations between and among Kresge, Western Electric, and Chase. The Court so finds on the basis of the following evidence, none of which is seriously disputed, and much of which was actually introduced by plaintiff as part of its case and is, therefore, binding on plaintiff:

1. In July of 1963, William Baldwin, having succeeded his father as a trustee of The Kresge Foundation and as its attorney, was asked to take full charge of the disposition of the Kresge-Newark, Inc. department store business and the 715 Broad Street, Newark, building [Vol. I p. 238]. As of November 21, 1963, an initial broker's time ran out and not much of anything had occurred. At this time, Kresge was also faced with the impending resignation or retirement of its store manager and "something had to be done." [Vol. I p. 224]. On November 21, 1963 Mr. Baldwin approached Western Electric, which, as noted above, then occupied the eighth and ninth floors of the 715 Broad Street building. This effort proved unsuccessful [Vol. I pp. 226–227].

2. Exhibits P–21, P–22, P–23, and P–26, all were offered by plaintiff as plaintiff's exhibits. They consist of memoranda dated March 18, June 2, June 9, and October 2, 1964, respectively, by William Baldwin to his fellow trustees. A reading of these memoranda establishes without question that the June 9, 1964 lease was not an outgrowth of Kresge's decision to dispose of the business and the building and that the terms of that lease were the result of negotiations conducted over a period extending

from March 17, 1964 through September, 1964 entirely in good faith and without any effort to avoid further liability for commissions.

3. On March 1, 1964, while Kresge was in the midst of negotiations with another party, Mr. Baldwin received a telephone call from Western Electric advising him that Western Electric had reconsidered its decision of December 16, 1963 [Vol. I p. 228]. At this point, the existing lease had three years to go. A meeting with Western Electric took place on March 17, 1964 which lasted for three hours. At it, Western Electric outlined its plan for consolidation of its Newark operations and itemized its requirements insofar as the renovation and upgrading of the space was concerned. It was then estimated that these requirements would cost in the neighborhood of a million dollars [P–21]. From this alone, it is apparent that the parties were not talking about a renewal under the terms and conditions of the existing lease or a taking of additional space under its terms and conditions.

4. Plaintiff's exhibit P–22 describes the relationship of the execution of a new lease with Western Electric to the sale by Kresge to Chase and evidences a complete renegotiation of the rental. This exhibit and plaintiff's exhibit P–26 also reflect the extraordinary complex nature of the negotiations negating any intimation of manipulation to avoid a broker's commission.

5. On May 11 and again on July 20, 1964 Schlesinger notified Kresge of its claim to further commissions on any new lease transaction [P–29 and P–30]. Exhibit P–21, dated March 18, 1964, shows that the basic nature of the renegotiation with Western Electric was well established before Schlesinger gave notice of its claim. Mr. William Baldwin testified that when he commenced negotiations with Western Electric in March he did so without awareness of the additional space provisions of the 1957 Lease [Vol. I p. 231].

6. On May 8, 1964 Mr. Baldwin wrote to Western Electric setting out Kresge's basic proposal with respect to a new lease [D–13]. As of that date Mr. Baldwin had not received any communication, oral or written, directly or indirectly, from broker indicating that it would claim a commission by reason of the new negotiations with Western Electric [Vol. I p. 247]. When Mr. Baldwin entered into negotiations with Western Electric in March of 1964, he regarded his commission arrangement with Schlesinger at that time to be "zero" [Vol. I p. 253]. After receiving P–29 and P–30, Kresge obtained from Chase an indemnification against further broker's claims. [See September 28 and October 1, 1964 amendments to P–19 and Vol. I pp. 253–255].

7. The renovations on the five floors which are the subject of the June 9, 1964 lease were made at a cost of $1,975,000 [Vol. I p. 363], all at the request of Western Electric and not at the request of either Chase or Kresge [Vol. I p. 372]. Western Electric's building requirements are set forth at length in Exhibit D–15 which contains the following introductory statement:

"Listed below is a tabulation of items of work which are considered a requisite in the modification of the Kresge Building, making it suitable for Western Electric Company's occupancy." [D–15].

8. Mr. Bardi, the Manager of Plant Facilities and Equipment for the Service Division of Western Electric Company, testified as to the consolidation plans which resulted in Western Electric's decision to open negotiations with Kresge [Vol. I p. 305], after having previously expressed no interest [Vol. I p. 308]. He described the upgrading that would be required on all five floors to make them suitable for the purpose which Western Electric had in mind [Vol. I pp. 311–315 and see D–18]. He also testified that on April 30, 1964 Mr. Chase came into the picture and that the lease negotiations were then continued with him on various dates in April, May, and

June [Vol. I pp. 319 and 325]. He made it clear that Western Electric was concerned with a "total occupancy" and that all of the space was to be provided "at the same level" [Vol. I p. 323]. He stated, "We negotiated the entire space as a new full package * * *" [Vol. I p. 324].

9. Mr. Lyne also testified as to the extent and nature of the negotiations in which he participated with Western Electric which took place from May through September [Vol. I pp. 336 and 372]. There were negotiations in May concerning the premises, the term, the tax increase clause, the time for delivery and the renovations [Vol. I pp. 337–338]. The foregoing negotiations required complete redrafting [Vol. I p. 343]. After the closing of the stock sale on June 1, 1964, there were long negotiating sessions on June 1, June 2 and again on June 7 [Vol. I pp. 344–346, 351–352]. At this time, the first June 9, 1964 lease had been executed, which required the landlord to pay for the renovations [P–17]. The June and July negotiations centered about this problem and on July 7 agreement was reached whereby Western Electric would advance the $1,975,000 required for renovations [Vol. I pp. 354 and 356]. This resulted in a renegotiation of the rent [Vol. I p. 357]. There followed a change in the condemnation award clause [Vol. I p. 358] and a readjustment of the schedule whereby space was to be delivered [Vol. I p. 358]. At Western Electric's request, a whole new lease was prepared which became the second June 9, 1964 lease which was ultimately executed in September [Vol. I pp. 359–360 and P–18]. Exhibit D–19 is a letter dated July 15, 1964 from Western Electric's house counsel to Mr. Lyne which lists the matters still under negotiation as of that date [Vol. I p. 363]. Exhibit D–20 is a letter from Mr. Lyne to Western Electric dated August 5, 1964 which sets forth the items still under negotiation [Vol. I p. 364]. Exhibits D–21, D–22, D–23, D–24 and D–25 record details of the final negotiation and eventual approval of plans and specifications which ultimately, on September 29, 1964, consummated the June 9, 1964 lease arrangement [Vol. I pp. 365–372].

10. On October 1, 1964 the lease between The Kresge Foundation and Kresge-Newark, Inc., the department store, and the lease between The Kresge Foundation and Western Electric, Inc. were assigned to Chase-Newark Corporation upon its acquisition of title to the 715 Broad Street premises [Vol. I p. 373]. Contemporaneously with the closing of title on the building, the lease between The Kresge Foundation and Chase-Newark Corporation [D–9] (formerly Kresge-Newark Inc.) was terminated [Vol. I p. 374 and D–26].

11. Such similarities as do exist between the June 9, 1964 lease and the 1957 lease are easily accounted for by the testimony of Mr. Lyne to the effect that Western Electric wanted to use the format of the 1957 Lease where possible as "boiler plate" [Vol. I p. 410].

12. In his summation, counsel for plaintiff conceded "* * * the plaintiff has produced no proof of bad faith on the part of the Kresge Foundation in negotiating the 1964 lease as to floors eight and nine." [Vol. I p. 476]. Plaintiff does not assert any bad faith as to the lease arrangements respecting four, five, and six, and the Court finds none.

13. Mr. Baldwin testified that he did not, at any time from the inception of his dealings with Western Electric in November of 1963 until the June 9, 1964 lease was executed in September of 1964, in any manner whatever, propose or intimate to Western Electric that the terms of any lease arrangement should be changed from those contained in the 1957 Lease so as to avoid paying a new commission to broker [Vol. I p. 248].

14. Mr. Bardi testified that he did not have any discussions either with Chase or Baldwin concerning a brokerage commission on the new tenancy and never considered the question [Vol. I pp. 327–328].

15. Mr. Lyne testified as follows:

"Q. Did you at any time in your communications and contacts with Western Electric discuss the brokerage claim of the Louis Schlesinger Company?

A. No, I did not.

Q. And did you, Mr. Lyne, at any time in your negotiations with Western Electric Company propose or intimate in any manner whatsoever that the terms and conditions of the lease should be changed from what they were under the '57 arrangement so as to avoid a commission?

A. Absolutely no." [Vol. I pp. 396–397]

The Court finds that the differences between the June 9, 1964 lease and the 1957 Lease which defeat broker's claim resulted from bona fide, good faith negotiations arising out of all the circumstances of the case, particularly the extraordinary requirements and demands of Western Electric Company.

*Facts Pertaining To The Activity Of Broker In Michigan*

Broker is not licensed in Michigan [Vol. I pp. 121 and 177]. From the evidence recited above, the Court finds that before October 9, 1956, broker's efforts on behalf of Western Electric had not borne fruit, and broker had acted purely as a volunteer on behalf of its customer, Western Electric. Only after the unsolicited trip of broker to Michigan on October 9, 1956 (D–170) did Kresge take an interest in Western Electric [Vol. I pp. 26 and 28 and P–5]. On October 15, 1956 broker introduced Kresge's representatives to those of Western Electric in Detroit and negotiations began. This introduction and these negotiations occurred in Michigan [Vol. I pp. 28–30]. Other than the commission negotiations, broker had no further contact with Kresge concerning the lease for the entire period from November 8, 1956 until the lease of February 15, 1957 was executed [Vol. I pp. 49 and 86].

The Court finds that the most significant services performed by broker and the ones which originally put broker into a position to demand a commission were performed in Michigan [Vol. I pp. 79–86 and D–17].

*Facts Pertaining to Damages*

Plaintiff attempted to prove its damages by testimony of Joel L. Schlesinger who proffered a computation purportedly based on the Detroit rates and rules [Vol. I pp. 175–176 and D–8]. Plaintiff attempted to establish his expertise [Vol. I pp. 206–209]. His computation applied the Detroit rates against not only the rental provided in the June 9, 1964 lease but also the $1,975,000 paid by the tenant for improvements, treating this amount as rent [Vol. I p. 210]. There was testimony by defendant's expert, Mr. Andrews, to the effect that the customary application of the Detroit rates would not include renovation expenses as rent in computing the commission [Vol. II pp. 18–19]. While it is true that Mr. William Baldwin characterized the $1,975,000 as "advance rent," this was as he "understood it." [Vol. I p. 275]. Mr. Lyne conceded that the rent was reduced in return for the tenants paying the renovations but would not characterize it as advance rent [Vol. I p. 422]. It was he, and not Mr. Baldwin, who negotiated this item [Vol. I p. 356]. Mr. Schlesinger was clearly not qualified to interpret the Detroit rates and rules having never before had occasion to compute a commission thereunder [Vol. I pp. 198–199]. Although the decision of the Court in favor of defendant renders the question of damages moot, the Court observes that plaintiff has submitted inadequate proof to justify the inclusion of the $1,975,000 paid by Western Electric for renovations in the commission computation.

Plaintiff's proofs with respect to damages are also defective in that they assume that the Detroit rates are to be applied against the rental to be paid on the

new lease as if no prior lease had existed. Accordingly, he applied 5% for the first year's rent and 2½% for the next four years [Vol. I pp. 193, 204–205 and D–8]. This is contrary to defendant's expert's testimony which is to the effect that had there been a renewal or a taking of additional space, the proper rate to be applied would be the rate applicable from and after the previous lease. For example, the Detroit rates provide for 1% from and after the tenth year of a lease. Thus, a renewal for five years at the end of 10 years would be at the 1% rate rather than at the 5% and 2½% rate applicable during the first five years [Vol. II pp. 9–11 and P–13].

Should the Court have found in plaintiff's favor on the merits of this case, the determination of its damages would have had to be made in accordance with the testimony of Mr. Andrews.

## RECAPITULATION

The Court finds that:

 1. The Commission Agreement dated December 12, 1956, upon which plaintiff bases its claim, was intended by the parties to relate only to the commission which was paid in April of 1957 and not to any future commissions. The incorporation therein of the Detroit rates and rules was solely for the purpose of computing the amount of the commission to be paid on the original term.

2. The lessee did not avail himself of any privilege of renewal under provisions of original lease as required by Rule (e) or on the same terms and conditions as required by paragraph 3 of the 1957 Lease in order to bring Rule (e) into play.

3. The lessee did not have a privilege to take additional space under provisions of original lease within the meaning of Rule (e), the right of first refusal under the 1957 Lease being merely the right to negotiate for additional space.

4. Even if the right of first refusal which the lessee had under paragraph 3 of the 1957 Lease constituted a privilege to take additional space for purposes of Rule (e), the additional space which was ultimately leased was not taken under provisions of original lease as required by Rule (e).

5. Whatever rights the Lessee had with respect to additional space under the 1957 Lease pertained only to space which became vacant and available for leasing during the term of the 1957 Lease. Neither occurred. Instead, the space was specially made available upon the condition that it would be taken.

6. Inasmuch as paragraph 3 of the 1957 Lease required any offer of additional space to be accepted within 30 days after receipt of the offer, whatever rights the lessee had with respect to additional space were exhausted by the lessee's letter to Kresge dated December 16, 1963 rejecting Kresge's offer to make additional space available.

7. None of the parties involved in the negotiation of the June 9, 1964 lease molded or attempted to mold the transaction so as to avoid paying a further commission.

8. The most significant services performed by broker and the ones which put broker in a position to demand any commission at all were performed in Michigan.

## CONCLUSIONS OF LAW

 Jurisdiction in this case is properly invoked on the grounds of diversity of citizenship of the parties. Plaintiff is a New Jersey corporation, with its principal place of business in New Jersey. Defendant is a foundation, chartered by and with its principal offices in the State of Michigan. This action having been brought in the District of New Jersey the determination of the appropriate choice of law rule to be applied is governed by the laws of New Jersey. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); American Plan Corp. v. State Loan & Finance Corp., 365 F.2d 635 (3 Cir. 1966), cert. denied 385 U.S. 1011, 87 S.Ct. 719, 17 L.Ed.2d

548 (1967). Turning to the choice of law rules of New Jersey, the Courts of this state adhere to the rule that the validity of a contract is determined by the law of the place of contracting. Colozzi v. Berko, Inc., 17 N.J. 194, 110 A.2d 545 (S.Ct. 1955); Staedler v. Staedler, 6 N. J. 380, 389, 78 A.2d 896, 28 A.L.R.2d 1291 (S.Ct. 1951). The existence of illegality, as noted above, is likewise determined by the law of the state of contracting. Staedler v. Staedler, *supra.* Restatement, Conflict of Laws Sect. 428 (1934) and Tentative Draft No. 6, Restatement 2nd, Conflict of Laws Sect. 334(c) (2) (1960). "The illegality of a contract is to be determined by the law of the place of contract. If that law makes the contract itself illegal, of course, it is void everywhere." *id.* at 389. Under the provisions of N.J.S.A. 2A:82–27 and 28 this Court may take judicial notice of the common or statute law of another state and may inform itself of such laws in such a manner as it may deem proper. In Re Damato, 86 N.J.Super. 107, 206 A.2d 171 (App.Div. 1964); Axinn Co. v. Gibralter Development Inc., 45 N.J.Super. 523, 535, 133 A.2d 341 (App.Div.1957). Michigan contacts predominate. Not only were broker's most significant acts performed in Michigan, the Commission Agreement was first discussed there [Vol. I pp. 87, 138–139], the Commission Agreement [P–9] incorporated the rates and rules of the Detroit Michigan Real Estate Board, the landlord is a Michigan corporation domiciled there (and thus within the class of persons intended to be protected by the Michigan statute), and the Commission Agreement in its final form was sent to Michigan [Vol. I p. 121 and P–14], and executed there [P–15 and Vol. I p. 122]. The Michigan Compiled Laws (1948) make it unlawful for any person or firm " * * * to engage in the business or capacity, either directly or indirectly, of a real estate broker or real estate salesman" in Michigan without first obtaining a license under the provisions of said act [D–29 Section 451.201]. A real estate broker is de-

fined, by Michigan law, as any person or firm " * * * who with intent to collect or receive a fee * * * leases or offers to lease * * * any real estate or the improvements thereon, for others * * * ". A real estate salesman is similarly defined [D–29 Section 451.202]. The commission of a single act prohibited by the statute constitutes a violation [D–29 Section 451.203]. The penalty for violation of the Act is a fine or imprisonment or both [D–29 Section 451.-219]. Since this contract would have been void for illegality under Michigan law, (See: Krause v. Boraks, 341 Mich. 149, 67 N.W.2d 202 (Sup.Ct. 1954)) it cannot be enforced in New Jersey. Staedler v. Staedler, *supra.* In Tanenbaum v. Sylvan Builders, Inc., 29 N.J. 63, 148 A.2d 176 (S.Ct. 1959), the New Jersey Supreme Court refused to allow a New York broker to collect a commission for the sale of land, in conjunction with a licensed New Jersey broker, in the State of New Jersey. Basing its ruling on the strong public policy of this State to control and regulate brokers, the Court strongly recognized the New Jersey rule that "[O]rdinarily, the validity of a brokerage contract, like any other compact, is determined by the law of the place where made. Yoerg v. Northern N. J. Mtg. Associates, 44 N.J.Super. 286, 292, 130 A.2d 392 (App.Div. 1957)." See also: Stahl v. Township of Teaneck, 162 F.Supp. 661 (D.Ct.N.J. 1958). The question therefore becomes one of whether what is sauce for the goose is also sauce for the gander. Allowing a New Jersey broker to collect a fee for a transaction negotiated in Michigan would not limit the ability of this state to regulate brokers in New Jersey. Nevertheless, the Courts of a state have long been obliged to consider the competing policies and interests of a sister state. Alaska Packers Assoc. v. Industrial Accident Commission, 294 U.S. 532, 55 S.Ct. 518, 79 L.Ed. 1044 (1932). There is no reason to believe that Michigan's interest in regulating the activities and contracts of brokers in Michigan is not as great as New Jersey's own

regulatory concerns. Michigan was not a fortuitous meeting place, it was the home of one of the parties to this controversy which plaintiff chose to journey to and negotiate at. Under such circumstances, and in the light of the ordinary New Jersey choice of law rule governing contracts, this Court believes that Michigan law would have voided the 1956 agreement and, as such, the agreement is likewise void in New Jersey.

Going beyond this, however, while the agreement must be read to include the rates and rules of the Detroit Real Estate Board, Louis Schlesinger Company v. Kresge Foundation, 388 F.2d 208 at 211, the new lease by defendant to Western did not fall within rule (e) of the Detroit Real Estate Board nor within paragraph 3 of the 1957 Lease. As noted above, the evidence indicates that the right of first refusal referred to in paragraph 3 of the 1957 Lease was merely the right to *negotiate*, for additional space; it was not a *right to take additional space*. Even assuming that paragraph 3 brought the parties within the provisions of rule (e), the taking of additional space had to be "under provisions of the original lease." The new lease terminating the 1957 Lease and giving the tenant additional space at a different rental and requiring substantial improvements in the premises as well as other requirements did not fall within rule (e) since the 1964 lease was a substantially different lease from the 1957 lease. Furthermore, the exercise of the option mentioned in paragraph 3 of the 1957 Lease, was rejected by the lessee in a letter to Kresge dated December 16, 1963. Likewise, this Court is satisfied by the evidence that the negotiations and activities leading up to the consummation of the 1964 lease were not part of an attempt to avoid the provisions of the 1957 Lease relating to brokerage commissions. Under these circumstances, and considering the intention of the parties as to the scope of the Detroit Rules, the lease of 1964 cannot be viewed as a renegotiation of the original lease but rather as the creation of a new lease. Thus, under the provisions of the 1957 Lease and the 1956 agreement, the 1964 transaction was not a renewal nor taking of additional space, and therefore plaintiff was not entitled to a new commission under that contract.

Accordingly defendant is entitled to judgment dismissing the complaint.

Let an Order in conformity with the foregoing opinion be presented.

## APPENDIX

*Comparison of Terms of 1957 Lease if Renewed
with Actual Terms of June 9, 1964 Lease*

| | Terms of 1957 Lease, if it had been renewed | Actual Terms of Second June 9, 1964 Lease |
| --- | --- | --- |
| Demised premises | 8th and 9th floors | 5th, 6th, 7th, 8th and 9th floors |
| Square footage | 105,178 sq. ft. | 262,500 sq. ft. |
| Term | 5 years from about 3/15/67 to 3/15/72 | About 5 years from execution on 9/14/64 to about 2/1/70, depending on date of final delivery of space |
| Renewal privilege | None | Two additional 1 year periods at $4.00 per sq. ft. per year, otherwise same terms |

| | | |
|---|---|---|
| Basic yearly rent | $3.83 per sq. ft., as modified by the air conditioning amendment of 3/22/61 | $2.495 per sq. ft., except $3.83 per sq. ft. on floors 8 and 9 until final delivery of space |
| Tax escalation | Pro rata of increases over 30% of 1956 base year | Pro rata share of increases over 1964 base year |
| Additional payments | None | $1,975,000.00 |
| Renovations | None | Exclusive lobby entrance, four new automatic elevators, other extensive renovations to change department store to office space |
| Heating | From 10/1 to 5/1 at lessor's expense; otherwise at lessee's expense. No temperature specified | Year-round 68° to 72° F at lessor's expense |
| Air Conditioning | None, except in amendment of 3/22/61; then temperature below 80°, humidity below 60% | Temperature below 76°, humidity below 50% |
| Additional space | None, unless there is a continuing right of first refusal over space becoming vacant and available for leasing at terms to be agreed on | Right of first refusal with "more favorable" reoffering clause |
| Voluntary cancellation | None before March 14, 1966 as modified by amendment of 3/22/61 | None |
| Termination of prior leases | None | 1957 lease specifically terminated, subject to reinstatement under certain circumstances |
| Condemnation | No right to damages | Right to share in damages to extent of Lessee's unamortized cost of providing funds for renovations |
| Fire | No right to extend term | Right in lessee to extend term for same time period as time period necessary to make repairs |